# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | | | |
|---|---|---|---|
| GORDON LAURIA and MARCOS PAPPAS, | : | | |
| Petitioners, | : | | |
| | : | | |
| v. | : | Case Nos.: | 3:96cr185 (PCD) |
| | : | | 3:01cv1893 (PCD) |
| UNITED STATES OF AMERICA, | : | | 3:01cv1894 (PCD) |
| Respondent. | : | | |

## RULING ON DEFENDANTS' MOTIONS PURSUANT TO 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE

Petitioners Gordon Lauria and Marcos Pappas move, *pro se*, for an order vacating, setting aside or correcting their sentences pursuant to 28 U.S.C. § 2255.[1]  For the following reasons, Petitioner Lauria's motion [Doc. No. 317] is **granted in part** and **denied in part** and Petitioner Pappas' motion [Doc. No. 318] is **denied**.

## I.      BACKGROUND

Defendant-Petitioner Gordon Lauria ("Lauria"), Defendant-Petitioner Marcos Pappas ("Pappas"), and Albert Bellucci ("Bellucci") were arrested by members of the New Haven Drug Task Force at Nancy's Café (a tavern in New Haven) on September 24, 1996 pursuant to a federal criminal complaint charging the three men with witness tampering in violation of 18 U.S.C. § 1512(b).

On October 8, 1996, a federal grand jury returned a three-count indictment against Lauria, Pappas, and Bellucci.  Count One charged them with conspiracy to retaliate against a witness in

---

[1]      Lauria's motion to adopt the arguments of petitioner Pappas in support of his § 2255 petition was granted on March 25, 2003. (See Ruling on Pending Motions, Mar. 25, 2004, Doc. No. 358.) Pappas' motion to adopt the arguments of petitioner Lauria in support of his § 2255 petition was granted on April 5, 2002. (See Endorsement, Apr. 5, 2002.)  Accordingly, all arguments—to the extent possible—will be considered in regard to both petitioners.

violation of 18 U.S.C. § 371, and Counts Two and Three charged Lauria and Pappas, and Lauria and Bellucci, respectively, with substantive retaliation offenses in violation of 18 U.S.C. § 1513(b)(2).

On April 3, 1997, a separate federal grand jury returned a four-count superseding indictment against Lauria, Pappas, and Alexander Rogers ("Rogers"), which added a new Count One, charging Lauria, Pappas, and Rogers with conspiracy to possess with the intent to distribute and to distribute an unspecified amount of cocaine, in violation of 21 U.S.C. § 846.  Counts Two and Three charged Lauria and Pappas with conspiring to retaliate against a witness, in violation of 18 U.S.C. § 371, and with retaliation against a witness, in violation of 18 U.S.C. § 1513(b)(2). Count Four charged Lauria alone with retaliation against a witness.  Bellucci was not charged in the superseding indictment.  Prior to trial, the government filed a Notice pursuant to 21 U.S.C. § 851 that in the event of conviction, Lauria would be subject to the enhanced penalties provided for in 21 U.S.C. § 841.

A jury was selected on June 3, 1997, and the jury trial of Lauria, Pappas and Rogers began on July 21, 1997.  On July 29, 1997, the jury found the defendants guilty on all counts.

On March 31, 1998, Lauria was sentenced to a total effective sentence of 420 months (or 35 years) imprisonment and a $25,000 fine.  He was sentenced to 420 months (or 35 years) imprisonment, followed by 10 years of supervision and a $25,000 fine on Count One; 60 months (or 5 years) imprisonment on Count Two; 120 months (or 10 years) imprisonment on Count Three; and 120 months (or 10 years imprisonment on Count Four.  The sentences on Counts Two, Three, and Four were to run concurrently with one another, and concurrent with the sentence imposed on Count One.

2

On April 2, 1998, Pappas was sentenced to a total effective sentence of 360 months (or 30 years) imprisonment.  He was sentenced to 360 months (or 30 years) imprisonment on Count One; 60 months (or 5 years) imprisonment on Count Two; and 120 months (or 10 years) imprisonment on Count Three.  The sentences on all three counts were to run concurrently with one another.

Both defendants filed a timely notice of appeal.  On his direct appeal, Lauria claimed that (1) the district court improperly precluded him from cross-examining a witness about his role in a drug conspiracy other than the drug conspiracy charged; (2) the government violated the federal anti-gratuity statute by offering leniency in exchange for the testimony of witnesses; and (3) his trial counsel was ineffective because he failed to request a multiple conspiracy instruction, or, in the alternative, that the trial court committed plain error by failing to charge the jury with such an instruction.  The Second Circuit Court of Appeals rejected Lauria's arguments and affirmed his conviction. See United States v. Lauria, No. 98-1214, 1999 U.S. App. LEXIS 26501 (2d Cir. Oct. 19, 1999).

On his direct appeal, Pappas claimed that (1) his conviction must be reversed because the district court denied his request to represent himself; (2) the case should be remanded for a new trial because the government impermissibly used peremptory challenges to exclude one juror on the basis of race and age and another juror on the basis of age alone; (3) the district court committed reversible error when it failed to excuse a certain error; (4) the district court allowed hearsay statements into evidence; (5) the district court failed to inquire whether the jury had read a newspaper article relating to Pappas; (6) the government acted as an unsworn witness during the trial proceedings; (7) the district court failed to give a limiting instruction regarding seized

evidence; (8) the evidence was insufficient to convict Pappas on any charged count as a matter of law; (9) the district court should have granted his post-trial motions for acquittal and for a new trial pursuant to Rules 29(c) and 33 of the Federal Rules of Criminal Procedure; and (10) the district court committed clear error when it denied Pappas' motion for a new trial. The Second Circuit Court of Appeals rejected all of Pappas' arguments and affirmed his conviction. See United States v. Pappas, No. 98-1206, 1999 U.S. App. LEXIS 26500 (2d Cir. Oct. 19, 1999).

On March 9, 2000, the Second Circuit Court of Appeals for the Second Circuit issued its Mandate affirming the judgment of the district court. On May 30, 2000, Lauria and Pappas petitioned for certiorari. On June 26, 2000, the Supreme Court of the United States issued its decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The Supreme Court denied Lauria and Pappas' petitions for certiorari on October 2, 2000. According to Lauria's motion, he placed the instant motion in the hands of the Bureau of Prisons for mailing on October 1, 2001. The district court received Lauria's § 2255 petition on October 5, 2000.

## II.    STANDARD OF REVIEW

The Court is mindful that the petitioners are proceeding *pro se*. As such, the Court construes their claims liberally and reads them "to raise the strongest arguments that they suggest." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

"Habeas review is an extraordinary remedy and 'will not be allowed to do service for an appeal.'" Bousley v. United States, 523 U.S. 614, 621, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998) (quoting Reed v. Farley, 512 U.S. 339, 354, 114 S. Ct. 2291, 129 L. Ed. 2d 277 (1994)). In that vein, "an error that may justify reversal on direct appeal will not necessarily support a collateral

attack on a final judgment" pursuant to 28 U.S.C. § 2255. <u>United States v. Addonizio</u>, 442 U.S. 178, 184, 99 S. Ct. 2235, 60 L. Ed. 2d 805 (1979) (noting that "[i]nroads on the concept of finality tend to undermine confidence in the integrity of our procedures," and the "increased volume of judicial work associated with the processing of collateral attacks inevitably impairs and delays the orderly administration of justice").

The general rule is that "where a petitioner does not bring a claim on direct appeal, he is barred from raising the claim in a subsequent § 2255 proceeding unless he can establish both cause for the procedural default and actual prejudice resulting [from the errors challenged]." <u>Billy-Eko v. United States</u>, 8 F.3d 111, 113-14 (2d Cir. 1993) (<u>citing</u> <u>United States v. Frady</u>, 456 U.S. 152, 167-68, 71 L. Ed. 2d 816, 102 S. Ct. 1584 (1982)); <u>accord</u> <u>Massaro v. United States</u>, 538 U.S. 500, 504, 123 S. Ct. 1690, 155 L. Ed. 2d 714 (2003) ("claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice"). The only other exception to this procedural default rule occurs if a petitioner can make a showing that he is "actually innocent" of crime for which he was convicted. <u>Bousley</u>, 523 U.S. at 622; <u>see also</u> <u>Doe v. Menefee</u>, 391 F.3d 147, 160-61 (2d Cir. 2004) ("An independent category of cases in which petitioners may suffer miscarriages of justice if they are procedurally barred from filing habeas petitions is composed of those cases in which the petitioners claim that they are actually innocent of the crimes for which they were convicted.").

"Cause" may be demonstrated by showing that the claims are based either on newly discovered evidence or some other objective factor unavailable to the defense that could not reasonably have been discovered before direct appeal. <u>See</u> <u>United States v. Helmsley</u>, 985 F.2d 1202, 1206 (2d Cir. 1993); <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d

397 (1986).  A petitioner can establish "prejudice" by showing that the alleged error worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982).

## III.  DISCUSSION

### A.    Petitioner Lauria

In his § 2255 petition, Petitioner Lauria claims (1) that all counts of the superseding indictment are jurisdictionally flawed as they each fail to state an offense; (2) that his Fifth Amendment due process right and Sixth Amendment right to a fair trial were violated by the government's failure to disclose exculpatory and impeachment material; (3) that the government failed to prove every element of each alleged offense beyond a reasonable doubt; (4) that his Sixth Amendment right to be confronted with the witnesses against him was violated; and (5) that his Sixth Amendment right to the effective assistance of counsel was violated.

### 1.    Lauria's § 2255 Motion was Timely Filed

The Court must first determine whether Lauria's motion was timely filed.  On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, § 105, 110 Stat. 1220 ("AEDPA"), was passed.  That law, amending 28 U.S.C. § 2255, enacted a one-year state of limitations for filings under that section.  The amended statute of limitations sections provides:

> A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of:
>
> (1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255.

Here, Lauria's conviction was "final" on October 2, 2000, when the Supreme Court denied his petition for certiorari. Inasmuch as Lauria's motion was presented to the Bureau of Prisons on October 1, 2001, it may be deemed timely filed.[2]

> 2.     Whether Certain of Lauria's Arguments Have Been Waived

Lauria's first four claims set forth in his § 2255 motion—i.e., that all counts of the superseding indictment are flawed since each count failed to state an offense, that his conviction was obtained in violation of his Fifth and Sixth Amendment rights due to the government's failure to disclose exculpatory and impeachment material, that the government was relieved of its burden of proving every element beyond a reasonable doubt, and that he was deprived of his Sixth Amendment confrontation rights—were not raised on direct appeal. Also raised for the first time in this motion is a jurisdictional challenge to the indictment based on the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). As they were not raised on direct review, the government contends that Lauria is barred from raising these issues now.

---

[2]        The government does not contest the fact that Lauria's § 2255 motion was timely filed.

Lauria must establish both "cause" and "prejudice" in order for this Court to be able to consider any claims not raised on direct review on collateral review. See Billy-Eko, 8 F.3d at 113-14. As to his first four claims, Lauria makes no showing of "cause" or "prejudice" to overcome the procedural bar to his arguments and accordingly, he is barred from raising them for the first time on collateral review.[3]

As discussed above, the only argument raised here that Lauria raised on direct appeal was an ineffective assistance of counsel claim. With regard to any ineffective assistance of counsel claims raised for the first time in this motion, the Supreme Court has held that "an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." Massaro, 538 U.S. at 504. Accordingly, all of Lauria's ineffective assistance of counsel claims may be reviewed here.

### 3.        Ineffective Assistance of Counsel Claims

Lauria raises ineffective assistance of counsel claims with regard to his trial counsel, sentencing counsel, and appellate counsel. Under the rule established in Massaro, 538 U.S. at 504, it is permissible for Lauria to raise these issues for the first time on collateral review.

The Sixth Amendment guarantees a fair trial and competent counsel in all criminal prosecutions. See U.S. CONST. amend. VI. The Sixth Amendment "stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not still be done." Gideon v. Wainwright, 372 U.S. 335, 343, 9 L. Ed. 2d 799, 83 S. Ct. 792 (1963). The Supreme

---

[3]        Contrary to Petitioners' assertions, it is clear that "defects in an indictment do not deprive a court of its power to adjudicate a case." United States v. Cotton, 535 U.S. 625, 630-31, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002) (noting that the Supreme Court "some time ago departed from [the] view that indictment defects are 'jurisdictional'").

8

Court has set out a two-prong test to be used to determine whether there was ineffective assistance of counsel.  In order to prove that an attorneys' conduct was ineffective, the petitioner must first prove that "his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms." <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To determine whether a counsel's conduct was deficient, "the court must . . . determine whether, in light of all of the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." <u>Id</u>. at 690.  In gauging the extent and severity of any deficiency, the court must be "highly deferential," must "consider[] all the circumstances," must make "every effort . . . to eliminate the distorting effects of hindsight," and must operate with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" or "that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" <u>Id</u>. at 688-89; <u>see also</u> <u>Lindstadt v. Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001) ("The <u>Strickland</u> standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard.").

If the petitioners succeed in making that initial showing, they must then prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694 (noting that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome").  Under this standard, the petitioners must do more than demonstrate "that the errors had some conceivable effect on the outcome of the proceeding," as "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome

9

undermines the reliability of the result of the proceeding." Id. at 693.  The Strickland Court held

that "[i]n making this determination, a court hearing an ineffectiveness claim must consider the

totality of the evidence before the judge or jury," and noted that "a verdict or conclusion only

weakly supported by the record is more likely to have been affected by errors than one with

overwhelming record support." Id. at 695-96.  "Taking the unaffected findings as a given, and

taking due account of the effect of the errors on the remaining findings, a court making the

prejudice inquiry must ask if the defendant has met the burden of showing that the decision

reached would reasonably likely have been different absent the errors." Id. at 696.

### a.  Trial Counsel

Gerald J. D'Ambrosio of Florida was retained to represent Lauria at trial, and on May 14,

1997, was admitted pro hac vice to do so.  In his § 2255 petition, Lauria claims that his trial

counsel, Attorney D'Ambrosio, was ineffective for (1) failing to adequately voir dire a juror; (2)

failing to bring the alleged perjury of a government witness to the Court's attention; (3) failing to

follow up on the identify of a confidential informant; and (4) failing to call a witness to testify at

trial.[4]

### i.  Juror Stochmal

Lauria claims that his trial counsel was ineffective for failing to challenge one of the

prospective jurors, Marianne Stochmal, during voir dire.

Jury selection took place on June 3, 1997, and during voir dire, Ms. Stochmal stated that

---

[4]     On appeal, Lauria raised one claim of ineffective assistance of counsel by arguing that his trial
counsel failed to request a Multiple Conspiracy Charge.  The Second Circuit found that this claim
failed to satisfy the requirements of the Strickland test and accordingly, it was dismissed. See
United States v. Lauria, No. 98-1214, 1999 U.S. App. LEXIS 26501, at *3 (2d Cir. Oct. 19, 1999).

she knew two Assistant United States Attorneys who worked at the United States Attorney's

Office in the District of Connecticut.  Following jury selection, that same day, Ms. Stochmal paid

a social visit to one of the individuals, Assistant United States Attorney David Sullivan.  When

she revealed that she had been selected as a juror in a criminal case, they both agreed not to

discuss the case further. (See Gov't Resp. to Order for Suppl. Briefing re: Lauria 56.)

Pappas moved to exclude Ms. Stochmal on the basis of this contact, and accordingly,

before the start of trial, the Court inquired further of Ms. Stochmal about how she had come to

know those two assistants. (See Transcript I at 71:25-73:25, July 21, 1997, Doc. No. 209.)  Ms.

Stochmal stated that she was a reporter for the New Haven Register and occasionally covered

court proceedings. (Id. at 72:12-73:11.)  She met the two assistants in that capacity, while she

was covering a trial they were conducting. (Id.)  Ms. Stochmal stated that her acquaintance with

these two assistants would not affect her judgment in the case, that she could base her decision

on the evidence, and that she could and would apply the law as the Court gave it to her. (Id. at

75:21-76:8.)  In response to the Court's question whether "there [is] anything that [she was]

aware of that would in any way influence [her] judgment and prevent [her] from deciding this

case solely on the basis of what [she] hear[s] in th[e] courtroom, the evidence and the law as

given to [her] by the Court," she replied, "I don't think so." (Id. at 77:17-23.)

Lauria alleges that during voir dire at jury selection, Ms. Stochmal "vaguely disclosed

that she and her family had been touched with violence in the past." (Lauria Pet. 10.)  Lauria

claims that even though he was charged with a violent crime, Attorney D'Ambrosio failed to

seek further inquiry into the specifics of the violence and Ms. Stochmal was ultimately selected

as a juror in this case.  At the July 21, 1997 inquiry of Ms. Stochmal, the Court referred to the

June voir dire and Ms. Stochmal's indication that she had some contact with law enforcement officials fourteen years earlier. (Transcript I at 77:24-78:4.)  Ms. Stochmal revealed that the incident had involved the death of her sister, and confirmed that at voir dire she had said that the situation would not in any way influence her judgment as far as the instant case was concerned. (Id. at 78:10-79:12.)  The Court asked if her view on the matter had changed since the voir dire, to which she responded that it had not and that she considered it "a whole separate issue than anything else I do—personally or professionally." (Id. at 79:13-20.)  Ms. Stochmal also revealed that someone had been prosecuted and convicted for her sister's murder and that she had served as a witness in the case. (Id. at 79:25-80:11.)  She said, however, that the only particular feeling she had for people charged with crimes was for the person charged with her sister's murder. (Id. at 81:6-11.)  She informed the Court that she would have no hesitation in applying the presumption of innocence and the government's burden of proof in the instant case. (Id. at 82:3-83:7.)  The Court asked additional questions about each of the charges in this case and whether any of them would give her a preconceived notion in the matter, and she indicated that they would not. (Id. at 84:7-85:17.)  Finally, in response to the Court's question as to whether there was anything "that would start [her] off with any feeling that [she] couldn't be fair and objective in deciding this case solely on the basis of the evidence that you hear in the courtroom," she replied, "no." (Id. at 85:18-86:5)

At the conclusion of the inquiry, Attorney D'Ambrosio argued that Ms. Stochmal should be excused. (Id. at 87:1-88:22.)  This Court denied the motion to excuse Ms. Stochmal, concluding, following the inquiry, that she could be impartial and that there was no need to excuse her for cause. (Id. at 94:23-96:8.)  In denying the motion to excuse, the Court noted that

12

counsel had the opportunity to seek further inquiry of Ms. Stochmal at jury selection and could

have exercised a peremptory challenge, but chose not to do so. (<u>Id</u>.)  The Court further found that

Ms. Stochmal had not discussed the case in any way with the two assistants, and there was no

showing that she would be anything other than impartial. (<u>Id</u>.)

 Lauria contends that his trial attorney's failure to take advantage of the voir dire process

to fully question Ms. Stochmal and failure to exercise a peremptory challenge in order to exclude

her from the jury pool constitutes ineffective assistance of counsel. (Lauria Suppl. Mem. Supp.

Pet. 9.)  Lauria asserts that his counsel's failure to seek further inquiry was not the product of any

"reasonable strategy," <u>Strickland</u>, 466 U.S. at 689, as evidenced by his subsequent attempt to

have Ms. Stochmal excused following her more lengthy disclosure.  Lauria asserts that he

suffered prejudice since his counsel, presumably, would have peremptorily stricken Ms.

Stochmal if he had sought further inquiry on the question of violence during voir dire. (Lauria

Suppl. Mem. Supp. Pet. 10.)

 Pappas raised this argument in his motion for a new trial, which was denied, and on

appeal.  In rejecting this argument, the Second Circuit held that:

> We see no abuse of discretion in permitting Juror [Stochmal] to remain on the jury
> after a full inquiry was made about these issues. Moreover, Pappas has not
> established that the jury that convicted him was not impartial. <u>See</u> <u>United States v.
> Rubin</u>, 37 F.3d 49, 54 (2d Cir. 1994) (holding that process of empaneling jury will
> not be disturbed unless district court abused its discretion and defendant establishes
> that jury was not impartial). Therefore, Pappas has failed to show that the district
> court's failure to excuse Juror [Stochmal] mandates reversal.

United States v. Pappas, No. 98-1206, 1999 U.S. App. LEXIS 26500, at *5 (2d Cir. Oct. 19,

1999).  In light of the Second Circuit's findings and the evidence presented here, it is found that

the petitioners fail to meet the second prong of the <u>Strickland</u> standard, which requires them to

show that the outcome of the trial would likely have been different if the juror had been successfully challenged and removed.  The Second Circuit found, as does this Court, that petitioners have not established that the jury was not impartial.  This Court appropriately found no reason to excuse Ms. Stochmal for cause and there has been no showing that the result of the proceeding would have been different if she had been peremptorily stricken.  Accordingly, this claim is without merit.

### ii.      Cross-Examination of Government Witnesses

#### A.      The Fassetts

Lauria also alleges that Attorney D'Ambrosio was ineffective for failing to "cross-examine trial witnesses Ronald Fassett and Christy Richards-Fassett with respect to the inconsistencies in the statements they gave subsequent to the incidents which relate to the retaliation counts of the superseding indictments, and other information which would have thrown the truthfulness of their respective testimony into question." (Lauria Pet. 10.)  As set forth in the government's response to this Court's Order for Supplemental Briefing, Lauria's trial counsel extensively cross-examined both Ronald Fassett and Christy Richards-Fassett.

Lauria's counsel cross-examined Ronald Fassett about his involvement with the individuals charged in the Luciano and Ramirez indictments, and tried to develop—through his cross-examination of Fassett—the defense that Fassett had actually been involved in a conspiracy which did not include Lauria or Pappas. (See Transcript III at 138:1-25, 140:18-43:5, July 22, 1997, Doc. No. 198.)  Counsel also tried to establish, on cross-examination, that Fassett had actually conspired with the members of the conspiracy with which he had been charged, rather than with Lauria and Pappas. (See id. at 141-44, 161:8-19.)  Lauria has failed to establish a

14

factual basis for his claim, or show that "his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms," or that he was prejudiced by his counsel's conduct. <u>Strickland</u>, 466 U.S. at 688, 694.

With respect to Christy Richards-Fassett, Lauria's trial counsel cross-examined her about a number of matters, including inconsistencies between her statements to the police and her trial testimony. (<u>See generally</u> Transcript V at 84-105, July 24, 1997, Doc. No. 211.)  An attorney's decision to pursue one line of questioning as opposed to another is a strategic decision which is "virtually unchallengeable" on collateral review. <u>Strickland</u>, 466 U.S. at 690.  In the instant case, Lauria has not overcome the strong presumption "that counsel's conduct falls within the wide range of professional assistance," or "that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" <u>Id</u>. at 689 (internal citations omitted).  As such, Lauria's claim pertaining to the Fassetts fails.

> B.     Special Agent Kevin James Kline

Lauria also contends that Attorney D'Ambrosio failed to cross-examine FBI Special Agent Kevin James Kline ("SA Kline") with respect to his alleged perjury before the grand jury. (<u>Id</u>. at 11.)  SA Kline was the case agent in this matter. (Lauria Suppl. Mem. Supp. Pet. 2.) Lauria asserts that prior to trial, Attorney D'Ambrosio was provided with a copy of the original charging document, the criminal complaint (sworn to by SA Kline), and copies of certain transcripts of SA Kline's grand jury testimony. (Lauria Suppl. Mem. Supp. Pet. 2; <u>see also</u> Kline Grand Jury Transcript, Mar. 5, 1997, Ex. S to Pet.)

Lauria contends that during his grand jury testimony on March 5, 1997, SA Kline read his prior October 8, 1996 grand jury testimony where he twice testified that co-defendant Pappas was

in Lauria's vehicle with Lauria and Albert "Chicky" Bellucci during the alleged September 21, 1996 car chase, charged in Counts Two and Four of the criminal complaint. (Lauria Suppl. Mem. Supp. Pet. 3; Superseding Indictment 3-5.)  Immediately following SA Kline's implication of Pappas in the September 21, 1996 car chase, Assistant United States Attorney Mark G. Califano asked SA Kline if his testimony conformed to the allegations in the criminal complaint. (See Kline Grand Jury Transcript at 28:1-5.)  SA Kline testified that his testimony did conform to the allegations in the criminal complaint, (see id. at 28:6), however, Lauria asserts that "there is no hint of an allegation in Kline's criminal complaint to the effect that Pappas was present during the alleged September 21, 1996 car chase." (Lauria Suppl. Mem. Supp. Pet. 3 (citing Criminal Compl., Ex. R to Pet.).)  Lauria contends that Attorney D'Ambrosio should have brought this "grand jury perjury" to the attention of the Court or the trial jury. (Id.)

According to Lauria, there was no other evidence—aside from SA Kline's testimony—from which the grand jury could have indicted him on the alleged conspiracy charged in Count Two of the superseding indictment. (Id. at 11.)  Lauria argues that since his counsel was provided with information demonstrating SA Kline's intentionally presented grand jury perjury, he should have moved to dismiss the superseding indictment in its entirety, or sought dismissal of the counts obtained via SA Kline's perjury and sought disclosure or in camera inspection of all grand jury minutes to determine if there was any further "taint." (Id.)  Further, Lauria argues that counsel should have cross-examined SA Kline with respect to his alleged perjury in order to raise a question as to SA Kline's credibility. (Id.)

Although SA Kline testified before the grand jury that Pappas was in the car involved in the second incident, Pappas was never charged in that indictment, let along convicted or

penalized for it, and nowhere in any of the charges or indictments is he described as being in the car or present at that second incident. Lauria has not established that there was any intent to introduce false testimony to the grand jury. It is clear—based on the absence of any allegation—that SA Kline's testimony was inadvertent, and was not used to prosecute Pappas. Moreover, the "perjury" was not repeated at Lauria's trial, and there is no evidence that the grand jury testimony was used against Lauria in any way at trial. Accordingly, it was not unreasonable for Lauria's trial counsel to avoid this line of inquiry in order to avoid losing credibility with the jury with a fruitless line of questioning. Lauria's trial counsel did extensively cross-examine SA Kline, and used him to point out weaknesses in the government's case, such as the lack of documents indicating any conversations with Lauria, the lack of wire taps or other information intercepting conversations or communications regarding Lauria, and the absence of any photographs of Lauria holding money. (See Transcript IV at 165:13-25.) Lauria's counsel also used SA Kline to try to cast doubt on the government's theory that narcotics paraphernalia seized from the hallway outside the Farren Avenue Apartment was linked to the defendants. (See id. at 166:5-167:24.) Again, Lauria has not overcome the strong presumption "that counsel's conduct falls within the wide range of professional assistance." Strickland, 466 U.S. at 689. In the face of "overwhelming evidence against Lauria," as found by the Second Circuit, (United States v. Lauria, No. 98-1214, 1999 U.S. App. LEXIS 26501, at *2 (2d Cir. Oct. 19, 1999)), Lauria has also failed to show that the outcome of the trial would have been different if counsel had pursued this line of inquiry with SA Kline over a tangential matter which was not material either to the government's case or to the defense. Because Lauria fails to satisfy either prong of the Strickland test, this claim fails.

17

iii.     Confidential Informant

Lauria argues that Attorney D'Ambrosio was ineffective for failing to ascertain the

identity of a confidential informant.  According to Lauria, Attorney D'Ambrosio received

information pertaining to Ronald Fassett, which indicated that Fassett was implicated in the

Luciano matter, in part, based on information given to investigators by a confidential informant

("CI 9"). (Lauria Suppl. Mem. Supp. Pet. 3-4; see also Wardrop Aff. at 33, Ex. D to Pet.)  Lauria

asserts that Attorney D'Ambrosio did not seek the identity of CI 9, nor did he seek any

statements, reports of interviews, or any other documents relative to CI 9, which Lauria asserts

"could have been used to advance the defense that R. Fassett, through his testimony, put Lauria

in the role of his true illicit ally, i.e., Raul Luciano." (Lauria Suppl. Mem. Supp. Pet. 4.)

Fassett testified at trial that he stopped dealing drugs with Raul Luciano in January of

1995, (see Transcript II at 11:10-18, July 21, 1997, Doc. No. 197), and that the narcotics seized

from his apartment in July and September of 1995 were supplied by Lauria, (see Transcript III at

31:7-47:25).  Lauria argues that if his counsel had obtained the identity of CI 9 and any other

information relied on by the government, he could have undermined Fassett's testimony on

cross-examination and established that the Fassett brothers and the evidence seized from their

apartments were part of the Luciano conspiracy, rather than a conspiracy among Fassett, Lauria

and Pappas. (Lauria Suppl. Mem. Supp. Pet. 15.)

The individual whom Lauria identifies as "CI 9" was not called to testify at trial, and

Lauria has not shown that any material evidence was withheld which would call into question the

outcome of the trial, or which would support Lauria's proffered defense.  As there has been no

showing that his counsel's conduct "fell below an objective standard of reasonableness under

18

prevailing professional norms," or that he was prejudiced by his counsel's conduct, Strickland, 466 U.S. at 688, 694, this claim is found to be without merit.

iv.     Video Surveillance Equipment

Finally, Lauria argues that Attorney D'Ambrosio was ineffective for failing to call Nancy DeAngelo to testify at trial.  At trial, the government presented video surveillance equipment seized from an apartment above Nancy's Café, the New Haven tavern where Lauria, Pappas and Bellucci were arrested on September 24, 1996.  The government argued that the video surveillance equipment was in the apartment for "illicit purposes." (Lauria Suppl. Mem. Supp. Pet. 4.)

According to Lauria, Attorney D'Ambrosio received a transcript of the grand jury testimony of Nancy DeAngelo, the owner of Nancy's Café and the apartment in question, in which Ms. DeAngelo testified that she purchased the video surveillance equipment for her own security purposes rather than for Lauria, as advanced by the government. (Lauria Pet. 12; see also DeAngelo Grand Jury Testimony, 20:20-21:19, 22:9-24:12, Ex. T to Pet.) (Id.)

Attorney D'Ambrosio represents that his failure to call Ms. DeAngelo as a defense witness "was not the product of any strategy" on his part, however, Lauria has not shown that he was prejudiced in any way by this failure. (D'Ambrosio Aff. ¶ 8.)  Ms. DeAngelo's explanation as to why the cameras were placed in and around the bar would not, by itself, have controverted evidence that the cameras and other surveillance equipment assisted Lauria and Pappas in their conduct of the drug trade.  Moreover, the proffered explanation would not have been sufficient to impeach the government witnesses who testified that members of the Lauria conspiracy monitored the surveillance equipment while narcotics were being prepared in the apartment.

Finally, the proffered explanation would not have changed the fact that surveillance equipment was seized from an apartment were cocaine was re-rocked and where there was other physical evidence of drug trafficking.  Since Lauria has failed to overcome the strong presumption "that counsel's conduct falls within the wide range of professional assistance," the failure to call Ms. DeAngelo as a witness at trial is "virtually unchallengeable" on collateral review. Strickland, 466 U.S. at 689-90.  Moreover, there is no showing here that Lauria was prejudiced by his counsel's conduct in this regard. Id. at 694.  As such, this claim fails.

b.    *Sentencing Counsel*

i.    Information

Bruce Cutler and Bettina Schein were admitted *pro hac vice* on October 20, 1997, after the close of the jury trial, to serve as Lauria's counsel during the sentencing phase of the proceedings.  Lauria claims that Attorneys Cutler and Schein erred by not moving to strike the government's information filed pursuant to 21 U.S.C. § 851, as the information does not state what Lauria's statutory penalty would be increased to, and does not state what the statutory penalty would have been absent Lauria's prior drug conviction. (Lauria Pet. 12; see also Information, Ex. U to Pet.)

The information was filed, pursuant to 21 U.S.C. § 851(a)(1), to notify Lauria and the Court of the government's intention to use the fact of Lauria's prior felony narcotics conviction to enhance his statutory minimum and maximum terms of imprisonment.  The information was filed on May 27, 1997, well before the commencement of trial in this case.  Pursuant to § 851(d)(1), "[i]f the person files no response to the information, or if the court determines, after hearing, that the person is subject to increased punishment by reason of prior convictions, the

20

court shall proceed to impose sentence upon him . . . ."  The statute does not require that the information state the specific enhancement to which the defendant would be exposed when taking the prior convictions into account.  All that the statute requires is that the government file, prior to the start of trial, an information with the Court and defendant's counsel "stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1).

Lauria has not shown that his sentencing counsel's conduct with regard to the information "fell below an objective standard of reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688.  His counsel did not respond to the information, however, Lauria has shown no reason for his counsel to submit a response.  Lauria argues only that the information failed to state what his statutory penalty would be increased to, or what the statutory penalty would have been absent his prior drug conviction, however, such information is not required. Lauria has also not shown that if his counsel had objected to the information, "there is a reasonable probability that . . . the result of the proceeding would have been different." Id.  The court properly determined that Lauria was subject to increased punishment by reason of his prior conviction.  The fact that the information failed to state the specific enhancement to which Lauria would be exposed when the prior conviction was taken into account does not change this result. See United States v. Harwood, 998 F.2d 91, 101 (2d Cir. 1993) (finding that "all the statute requires" is for the government to file an information identifying the prior conviction upon which the court is to rely in enhancing the defendant's sentence).  Given that courts within the Second Circuit have found sufficient notice even where no information was timely filed, see, e.g., Sapia v. United States, 433 F.3d 212, 215 (2d Cir. 2005) (even though information was not docketed until the day after the defendant entered his guilty plea, the court found, based on both the plea

21

agreement and plea colloquy, that the defendant had "actual notice" of the government's intention to use his prior felony conviction make him eligible for an enhanced sentence), this claim is without merit. Accordingly, this claim is without merit.

ii.     Career Criminal Classification

Lauria also claims, without any elaboration, that Attorneys Cutler and Schein failed to submit the "appropriate information" to the court in order to demonstrate that Lauria should not have been classified as a "career criminal." (Lauria Pet. 12.) In the absence of any facts being recited in the moving papers and the lack of any argument on the issue, this claim is without merit and is rejected.

iii.     Inability to Pay Fine

In addition to his term of imprisonment, this Court also imposed a $25,000 fine on Lauria at his sentencing. Lauria asserts that he was, and remains, unable to pay a fine, however, he claims that Attorneys Cutler and Schein failed to provide the court with information pertaining to his inability to pay a fine, and failed to object to the court's consideration of improper factors in determining that a fine should be imposed. (Lauria Pet. 13; see also Lauria Aff., Sept. 27, 2001, Ex. V to Pet.) Lauria's counsel also did not object to the imposition of the $25,000 fine. (Lauria Suppl. Mem. Supp. Pet. 5.)

The United States Sentencing Guidelines provide that a district court "shall" impose a fine in all cases, except where a defendant has demonstrated an inability to pay a fine. U.S.S.G. § 5E1.2(a).[5] In determining the amount of the fine, the court is authorized to consider, *inter alia*,

---

[5]     U.S.S.G. § 5E1.2(a) provides that: "The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."

"any evidence presented as to the defendant's ability to pay the fine." U.S.S.G. § 5E1.2(d)(2).

The court may also waive the fine if the defendant establishes that "(1) he is not able and, even

with the use of a reasonable installment schedule, is not likely to become able to pay all or part of

the fine required by the preceding provisions, or (2) imposition of a fine would unduly burden the

defendant's dependents." U.S.S.G. § 5E1.2(e).

The Second Circuit has held that "[a] defendant seeking to avoid a Guidelines fine on the

basis of inability to pay must come forward with evidence of that financial inability." United

States v. Marquez, 941 F.2d 60, 65-66 (2d Cir. 1991) (noting that under the prior version of §

5E12(a), it was unclear whether a defendant must come forward with evidence of an inability to

pay, or whether the court is required to consider the defendant's inability to pay in every case).

In determining whether a defendant has the ability to pay, "the court may consider both

defendant's present financial resources and those that may become available in the future."

United States v. Salameh, 261 F.2d 271, 276 (2d Cir. 2001).  Even if a defendant is indigent, the

court may still impose a fine if it finds that the defendant will have the earning capacity to pay

the fine from prison earnings or from earnings after his release from prison. United States v.

Thompson, 227 F.3d 43, 45-46 (2d Cir. 2000); United States v. Rivera, 971 F.2d 876, 894 (2d

Cir. 1992); United States v. Seminole, 882 F.2d 441, 443 (9th Cir. 1989).

Lauria asserts that his sentencing counsel was ineffective because they failed to submit a

financial affidavit to the court.  He claims that had such an affidavit been considered, it would

have proven his inability to pay and the court would have waived any potential fine.  Although a

financial affidavit could have been filed, it would not necessarily have precluded the court from

imposing this fine. See, e.g., United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir. 1996)

23

(finding that, despite his present indigence, there was no reason that the defendant could not pay a $10,000 fine over the course of twenty-five years of imprisonment out of his "likely prison earnings"); Thompson, 227 F.3d at 45 (although the defendant was presently unable to pay the fine imposed, the court found that he would be capable of paying off the $5,000 fine with future prison earnings). Lauria was in his late twenties at the time of sentencing, and is fully capable of working during his term of imprisonment. Even in light of a financial affidavit, it could have been found that Lauria would be able to pay the fine out of his prison earnings, or from earnings after his release.

Lauria argues, however, that this argument is too speculative, as the Court's decision to impose a fine was based on the lack of proof of an inability to pay the fine. (Lauria Reply 15.) Indeed, during sentencing, the Court found that "Lauria has profited by the business to a substantial degree, and therefore warrants a fine," and noted that there was "no basis to find that [Lauria was] otherwise unable to pay a fine." (Lauria Sentencing Transcript at 95:23-96:, Mar. 31, 1998, Doc. No. 271.) Lauria asserts that a financial affidavit demonstrating his lack of ability to pay, coupled with evidence of his "health-related infirmities," would have mandated a different result, (Lauria Reply 15), but the burden of proving that is his. He has failed to provide the Court with a financial affidavit, and as such, there is no basis to find that the petitioner's claim is well-founded. Because there has been no showing that the result of the proceeding would have been different had Attorney D'Ambrosio submitted a financial affidavit at the time of sentencing, this claim fails.

iv.    Apprendi-Based Objection

Finally, Lauria argues that Attorneys Cutler and Schein were ineffective for failing to

object to this Court's findings at sentencing that some amount of cocaine above a "detectable amount," as found by the jury, was involved in the crime and should be considered in establishing Lauria's base offense level. (Lauria Pet. 13.)  Because the substance of this claim is decided below, this issue is now moot.

> c.  *Appellate Counsel*

Bruce Cutler and Bettina Schein also served as Lauria's counsel on his direct appeal.

> i.  Speedy Trial Issue

Lauria argues that Attorneys Cutler and Schein erred in failing to raise a Speedy Trial Act issue on direct appeal even though the court allegedly failed to make the contemporaneous "ends of justice" findings when it granted extensions of the trial date. (Lauria Pet. 13.)  The government contends that this argument is without merit, asserting that the issue was raised in a pretrial motion, (see Lauria Mot. Dismiss, May 14, 1997, Doc. No. 91), and dismissed by this Court at that time, (see Ruling, June 24, 1997, Doc. No. 138). (Gov't Resp. to Lauria Pet. 16.)

On May 14, 1997, counsel for Lauria filed a motion to dismiss Counts Two through Four on the ground that Lauria's right to a Speedy Trial had been violated.  On June 24, 1997, the district court ruled on a number of pretrial motions, at which time it denied Lauria's Speedy Trial motion, finding that Lauria "filed multiple motions to continue jury selection and to extend the time for filing of pretrial motions because of the newness of the case, trial schedule of counsel and his interest in considering a plea offer from the government.  All of that time for which continuances were granted is excludable because 'the ends of justice served by the granting of such continuance outweigh the best interest of the public and the defendant in a speedy trial.'" (Ruling on Pretrial Motions 2-3, June 24, 1997, Doc. No. 138.)  Although the Court did not

specifically articulate the ends of justice finding in every ruling granting the petitioner's requests for continuances, that finding was at least implicitly, if not explicitly, invoked by the petitioner's requests for continuances.  Lauria asserts that the Court's basis for denying the motion, i.e., that the 147 days were excludable under the Speedy Trial Act, (see Ruling on Pretrial Motions at 3 and n.1), was incorrect.

The Speedy Trial Act provides that "[i]n any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment." 18 U.S.C. § 3161(c)(1).  Under the Act, certain periods of delay shall be excluded in computing the time within which the trial must commence.  The excludable periods of delay include, *inter alia*, "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion," 18 U.S.C. § 3161(h)(1)(F), "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning defendant is actually under advisement by the court," § 3161(h)(1)(J), "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted," § 3161(h)(7), and "[a]ny period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial," § 3161(h)(8)(A).  This final basis for excluding time from the speedy-trial clock requires that "the court set[] forth, in the record of the case, either

26

orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." Id.

If a trial does not begin on time, the defendant may move, before the start of trial, to dismiss the charges, and if a meritorious and timely motion to dismiss is filed, the district court must dismiss the charges, though it may choose whether to dismiss with or without prejudice. 18 U.S.C. § 3162(a)(2); Zedner v. United States, ___ U.S. ___, 126 S. Ct. 1976, 1984, 164 L. Ed. 2d 749 (2006). In making that choice, the court must take into account, *inter alia*, "the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of [the Act] and on the administration of justice." 18 U.S.C. § 3162(a)(2). The defendant, in bringing such a motion, bears the burden of proof. Id.

The record reveals that Lauria made seven motions for extension of time between November of 1996 and May of 1997,[6] whereas the government made only such motion, in May of 1997. Moreover, the one motion for extension of time filed by the government merely sought an extension of time to respond to Lauria's pre-trial motions, and did not affect the jury selection or trial dates. The minimal delay in the proceedings was due to Lauria's requests for continuances, the basis for which were all to permit him to pursue his defense. Accommodating him by granting the requested continuances clearly met the "ends of justice" test, even though a

---

[6]      On November 5, 1996, Lauria moved for a two-week extension of time to file his substantive motions. Two weeks later, on November 18, 1996, he moved for a three-week extension of time to file his substantive motions. Over three weeks later, on December 12, 1996, Lauria moved to postpone jury selection thirty days. Two weeks later, on December 27, 1996, he again moved to postpone jury selection, this time until February of 1997. Then, on March 6, 1997, Lauria moved to postpone jury selection "until the next jury call." The Superseding Indictment was filed on April 3, 1997, and on May 12, 1997, Lauria moved for an extension of time, until June 16, 1997, to file his pre-trial motions. Four days later, on May 16, 1997, Lauria moved to continue the trial date until July 7, 1997. This Court granted all of Lauria's motions for extensions of time.

finding to that effect was not specifically articulated on the record.  The Supreme Court recently

resolved a circuit split and held, pursuant to § 3161(h)(8)(A)'s unambiguous language, that even

when the continuances are granted at the defendant's request, the trial judge still must make,

orally or in writing, and on the record, the requisite findings regarding the need for an

ends-of-justice continuance. <u>Zedner</u>, 126 S. Ct. at 1989.  If the requisite findings are not made on

the record, "the delay resulting from the continuance must be counted, and if as a result the trial

does not begin on time, the indictment or information must be dismissed." <u>Id</u>.

      Prior to the Supreme Court ruling in <u>Zedner</u>, however, the Second Circuit adhered to the

rule that "when a defendant requests an adjournment that would serve the ends of justice, that

defendant will not be heard to claim that her Speedy Trial rights were violated by the court's

grant of her request, regardless whether the court made an 'ends of justice' finding under §

3161(h)(8)." <u>United States v. Zedner</u>, 401 F.3d 36, 45 (2d Cir. 2005), <u>reversed by</u> 126 S. Ct.

1976, 164 L. Ed. 2d 749 (2006).  Because the Second Circuit, at the time this case was on appeal,

did not require a judge in all cases to make explicit ends of justice findings, on the record, when

the defendant requested a continuance, and because of the relatively short delay at issue here, it

cannot be shown that Lauria's appellate counsel's "performance fell below an objective standard

of reasonableness under prevailing professional norms." <u>Strickland</u>, 466 U.S. 688.  Therefore,

this claim is dismissed.

      ii.      Public Closure of Jury Selection

      Lauria asserts that Attorneys Cutler and Schein erred in failing to raise another "structural

error" issue on appeal, this one relating to the public closure of jury selection in this matter.

(Lauria Pet. 14.)  According to the government, the courtroom was closed during voir dire

because there was a large number of potential jurors and thus no room in the courtroom for the public. (Gov't Resp. to Lauria Pet. 18.)

The transcript reveals that Bruce Koffsky, trial counsel for Lauria's co-defendant, Marcos Pappas, informed the Court that Pappas had several family members living in town who had come to the courthouse to watch jury selection. (See Jury Sel. Trans. at 4:2-7, June 3, 1997, Ex. W to Lauria Pet.)  The Court, however, decided that the courtroom would be closed to the public because of the small size of the courtroom and the large number of potential jurors. (See id. at 4:2-5:15.)  Judge Burns reasoned that "it is not a large courtroom and we have a large number of jurors and I'm afraid we can't accommodate [Pappas' family members] . . . . or permit them to be that close to the jurors." (Id. at 4:8-18.)  Judge Burns stated that she "can understand their interest," and proposed that all the potential jurors be brought into the courtroom so that she could "see what the lay of the land is," however, the courtroom was not able to accommodate Pappas' family members. (Id. at 4:19-5:2.)  The courtroom was not closed for the duration of the trial, but only for the portion of voir dire which required all potential jurors to be in the courtroom.

The Supreme Court, in Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 65 L. Ed. 2d 973, 100 S. Ct. 2814 (1980), stated that the "right to attend criminal trials is implicit in the guarantees of the First Amendment," and that "without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and of the press could be eviscerated." Id. at 580 (internal quotation marks omitted).  The Supreme Court has further recognized that the guarantee of open public proceedings in criminal trials extends to the voir dire examination of potential jurors during jury selection. Press-Enterprise Co. v. Superior

Court, 464 U.S. 501, 504-10, 78 L. Ed. 2d 629, 104 S. Ct. 819 (1984) ("Press-Enterprise I"). The

constitutional right of access, however, is not absolute, and must, in certain circumstances, "give

way . . . to other rights or interests." Waller v. Georgia, 467 U.S. 39, 45, 81 L. Ed. 2d 31, 104 S.

Ct. 2210 (1984). With regard to voir dire proceedings, the Supreme Court stated:

> The presumption of openness may be overcome only by an overriding interest based
> on findings that closure is essential to preserve higher values and is narrowly tailored
> to serve that interest. The interest is to be articulated along with findings specific
> enough that a reviewing court can determine whether the closure order was properly
> entered.

Press-Enterprise I, 464 U.S. at 510. In Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 92 L.

Ed. 2d 1, 106 S. Ct. 2735 (1986) ("Press Enterprise II"), the Supreme Court laid out a balancing

test for trial courts to use when determining whether closure is appropriate: "The [proceeding]

shall be closed only if specific findings are made demonstrating that, first, there is a substantial

probability that the defendant's right to a fair trial will be prejudiced by publicity that closure

would prevent and, second, reasonable alternatives to closure cannot adequately protect the

defendant's fair trial rights." Id. at 14.

In this case, Judge Burns decided to close the courtroom to the public in order to enable

voir dire to move faster and more efficiently, by allowing all potential jurors to be in the

courtroom at once. Between the small courtroom and the large number of potential jurors, Judge

Burns found that it was not possible to have all potential jurors and members of the public in the

courtroom at once. The transcripts of the jury selection were not sealed or closed to the public,

but are matters of public record.

Although the court's findings may not have been as specific as would be desirable, Lauria

has failed to show that the failure to raise this issue on appeal constituted performance that fell

below "an objective standard of reasonableness under prevailing professional norms." <u>Strickland</u>, 466 U.S. 688.  There has been no showing that this in any way deprived Lauria of his right to an open and fair trial.  Notably, Lauria's trial counsel did not object to the closure and neither Lauria's counsel nor Pappas' counsel presented any alternatives to closure. (<u>See</u> Jury Sel. Trans. at 4:2-5:15.)  Judge Burns was not required to, sua sponte, consider further alternatives to closure. <u>Ayala v. Speckard</u>, 131 F.3d 62, 71 (2d Cir. 1997) (en banc) (holding that "once a trial judge has determined that limited closure is warranted as an alternative to complete closure, . . . . it becomes the obligation of the party objecting to the trial court's proposal to urge consideration of any further alternatives that might avoid the need for even a limited closure").  It is difficult to see how the exclusion of several of Pappas' family members from the jury selection deprived Lauria of his right to an open and fair trial.  Rather, the large number of potential jurors made it more likely that Lauria and Pappas could obtain a fair and impartial jury.   Moreover, Lauria has not shown, and cannot show, that if his counsel had raised this issue on appeal, "there is a reasonable probability that . . . the result of the proceeding would have been different." <u>Id</u>. Accordingly, this claim is dismissed.

iv.     Cumulative Effect

Lauria argues that the alleged errors he attributes to his appellate counsel, i.e., (1) failing to raise the speedy trial issue on appeal and (2) failing to raise the error relating to the closure of jury selection, considered "in the aggregate," demonstrate that Lauria was deprived of his right to the effective assistance of appellate counsel. (Lauria's Suppl. Mem. Supp. Pet. 26.)  In <u>Lindstadt v. Keane</u>, 239 F.3d 191 (2d Cir. 2001), the Second Circuit, interpreting <u>Strickland</u>, held that alleged errors should be considered "in the aggregate," and directed courts to consider the

31

"cumulative weight of error." Id. at 199, 202 (noting that "Strickland directs us to look at the 'totality of the evidence before the judge or jury,' keeping in mind that 'some errors [] have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture. . . .' (quoting Strickland, 466 U.S. at 695-96)). "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by [counsel's] errors," Strickland, 466 U.S. at 696, however, where there is overwhelming evidence of guilt, even serious errors by counsel will not warrant granting a writ of habeas corpus, see Lindstadt, 239 F.3d at 204.  Here, the evidence of guilt was overwhelming. See United States v. Lauria, No. 98-1214, 1999 U.S. App. LEXIS 26501, at *2-3 (2d Cir. Oct. 19, 1999).[7]  In the instant case, all of the alleged instances of ineffective assistance of counsel, considered alone, have been found to be without merit.  That result does not change when they are considered in the aggregate.

### 4.     *Apprendi*-Based Claims

The Second Circuit has held that Apprendi does not apply retroactively on collateral review. Coleman v. United States, 329 F.3d 77, 82 (2d Cir.) (holding that "Apprendi is a new rule that does not apply retroactively to initial section 2255 motions for habeas relief"), cert. denied, 540 U.S. 1061, 124 S. Ct. 840, 157 L. Ed. 2d 719 (2003).  On June 26, 2000, after Petitioners' petitions for certiorari were filed with the Supreme Court, the Supreme Court decided Apprendi.  Because Apprendi was decided while Petitioners' direct appeals were pending, its holding would have applied retroactively in that appeal. See Guzman v. United

---

[7]     The Second Circuit found "overwhelming evidence against Lauria," specifically noting "the government sponsored several witnesses who offered independent evidence of the charged conspiracy and Lauria's involvement in it, as well as records, physical evidence, and the testimony of law enforcement officers." United States v. Lauria, No. 98-1214, 1999 U.S. App. LEXIS 26501, at *2-3 (2d Cir. Oct. 19, 1999).

States, 277 F. Supp. 2d 255, 263 (2003) (citing United States v. Joyner, 313 F.3d 40, 45 (2d Cir.

2002)); see also Coleman, 329 F.3d at 83.[8]  Petitioners' attorneys could have moved to file a

supplemental brief in light of the new case law, but they did not.  The issue was ignored and the

Supreme Court denied the petitions for certiorari on October 2, 2000.  Because Apprendi does

not apply retroactively to initial § 2255 motions for habeas relief, Petitioners' Apprendi claims

fail.  Because Petitioners are pro se, however, this Court will construe their allegations as raising

a claim that appellate counsel was ineffective for failing to raise the Apprendi issue on direct

review.

     In Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), the

Supreme Court held:

> Other than the fact of a prior conviction, any fact that increases the penalty for a
> crime beyond  the prescribed statutory maximum must be submitted to a jury, and
> proved beyond a reasonable doubt.

Id. at 490.  Under Apprendi, once the government has proved to the jury all the elements of an

offense that triggers the imposition of a statutory maximum term of imprisonment, the court has

the power to determine factors relevant to sentencing that were not submitted to the jury, as long

as the court's determinations do not enhance the defendant's penalty above the statutory

maximum. See United States v. White, 240 F.3d 127, 135-36 (2d Cir. 2001).  Following

---

[8]    The Second Circuit in Coleman held that Apprendi "unquestionably announced a new rule of law."
Coleman, 329 F.3d at 83.  It is clear that "a new rule for the conduct of criminal prosecutions is to
be applied retroactively to all cases, state or federal, pending on direct review or not yet final."
Griffith v. Kentucky, 479 U.S. 314, 328, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987).  Moreover, in
Reed v. Ross, 468 U.S. 1, 16, 104 S. Ct. 2901, 82 L. Ed. 2d 1 (1984), the Supreme Court held that
a change in the law may constitute "cause" for failing to raise the issue on direct appeal. Id. at 16;
see also Murray v. Carrier, 477 U.S. 478, 488, 91 L. Ed. 2d 397, 106 S. Ct. 2639 (1986) ("[A]
showing that the . . . legal basis for a claim was not reasonably available to counsel . . . would
constitute cause under this standard.").

Apprendi, in prosecutions involving a drug charge, "the quantity of drugs must be charged in the indictment, submitted to the jury, and proved beyond a reasonable doubt." Coleman, 329 F.3d at 83 (citation omitted).  The Second Circuit has applied this rule to determinations of drug type and quantity under 21 U.S.C. § 841, but only to the extent that those determinations lead to the imposition of a sentence greater than the otherwise applicable statutory maximum. See United States v. Thomas, 274 F.3d 655 (2d Cir. 2001).  Accordingly, if a petitioner's sentence is below the statutory maximum, his Apprendi claim fails.[9]  Petitioners raise Apprendi-based challenges both to Count One of the superseding indictment and to their sentences.[10]

As found in this Court's April 16, 2004 Order Requiring Supplemental Briefing, Petitioners had an obligation to object to the failure to put the drug quantity issue in the indictment or before the jury, and—notwithstanding Pappas' assertion otherwise—failed to do so. (Order at 4-5, Apr. 16, 2004, Doc. No. 365.)  Where a defendant fails to raise any Apprendi-related objections in district court, his claim that he was sentenced for a crime not fully alleged in the indictment is a claim of error subject to plain error review pursuant to Federal Rule of

---

[9]    The Supreme Court has held that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washington, 542 U.S. 296, 303, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).  The Supreme Court later held, in United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), that Blakely applied to the federal sentencing guidelines, and therefore any fact—other than a prior conviction—necessary to support a sentence exceeding the maximum authorized by the facts established by the jury verdict, "must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Booker, 543 U.S. at 243-44.

[10]    Although Petitioners contend that they do not intend to challenge their sentences through their Apprendi-based claims, (see Pappas Reply 28; Lauria Reply at 18), choosing to focus instead on the defect created in the indictment and to argue that their entire conviction is suspect, they both raise the issue that the jury was not charged with finding a specific quantity of drugs beyond a reasonable doubt.  (Pappas Reply 7-8; Lauria Mem. Supp. Pet. 28-31.)  Therefore, being cognizant of a court's duty to "read [a pro se litigant's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest[,]" Soto v. Walker, 44 F.3d 169, 173 (2d Cir. 1995) (citation omitted), Petitioners are deemed to have raised the Apprendi sentencing argument.

Criminal Procedure 52(b). United States v. Thomas, 274 F.3d 655, 666 (2d Cir. 2001) (en banc).

Under Rule 52(b), before a court can correct an error not raised at trial, the court must find: (1)

error, (2) that is plain, and (3) that affects substantial rights. Johnson v. United States, 520 U.S.

461, 466-67, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997).  Under the Second Circuit's "modified

plain-error rule," applied where, as here, "the source of plain error is a supervening decision," the

government—rather than the defendant—bears the burden of establishing that the error did not

affect substantial rights, or that the error was harmless. United States v. Outen, 286 F.3d 622, 639

(2d Cir. 2002) (citing United States v. Monteleone, 257 F.3d 210, 233 (2d Cir. 2001)).[11]  If all

three of these conditions are met, the court may, in its discretion, notice the error, but only if "the

error seriously affects the fairness, integrity, or public reputation of judicial proceedings." United

States v. Cotton, 535 U.S. 625, 631, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002).

> a.    Error

In this case, the superseding indictment alleged that Petitioners conspired to possess with

the intent to distribute and to distribute an unspecified amount of cocaine, in violation of 21

U.S.C. § 846, and the jury found that they had, in fact, conspired to do those acts.  The jury was

not asked to consider the quantity of the drugs involved.  In this case, Lauria was sentenced to

420 months imprisonment on Count One of the indictment, which exceeds the statutory

maximum of 20 years prescribed by 21 U.S.C. § 841(b)(1)(C)—the provision applicable to a

crime involving an unspecified quanity—where no Section 851 Notice has been filed, and

---

[11]    In Outen, 286 F.3d at 640 n.18, the Second Circuit assumed, without actually deciding, that the modified plain-error rule remains good law after Johnson v. United States, 520 U.S. 461, 117 S. Ct. 1544, 137 L. Ed. 2d 1544 (1997).  The government does not argue the point here, and accordingly, it is assumed that the Second Circuit's modified plain-error rule remains good law.

exceeds the statutory maximum 30 years prescribed where, as here, a prior conviction for a felony drug offense has become final and a Section 851 Notice has been filed.[12]  Lauria's 35-year sentence was based on this Court's own findings, by a preponderance of the evidence, that Lauria's crime involved 500 or more grams of cocaine.[13]  Under Apprendi, therefore, the quantity of drugs involved in Lauria's crime constituted a "fact that increases the penalty for a crime beyond the prescribed statutory maximum," Apprendi, 530 U.S. at 490, and "constituted an element of the offense that should have been charged in the indictment, submitted to the jury, and proved beyond a reasonable doubt." Thomas, 274 F.3d at 667.  Accordingly, it is found that is was "error" to sentence Lauria to a term of imprisonment exceeding thirty years based on facts neither charged in the indictment nor found by the jury beyond a reasonable doubt.[14] Id.

> b.    Plain

An error is "plain" if it is "clear," or "'so egregious and obvious' that a trial judge and prosecutor would be 'derelict' in permitting it in a trial held today." Id. (quoting Johnson, 520 U.S. at 467-68; United States v. Gore, 154 F.3d 34, 43 (2d Cir. 1998)).  The Thomas court held,

---

[12]    21 U.S.C. § 851(a)(1) provides, in pertinent part, that: "No person who stands convicted of an offense under this part [21 USCS §§ 841 et seq.] shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon."

[13]    21 U.S.C. § 841(b)(1)(B) provides that if a person is found to have committed a violation of § 841(a) that involved 500 grams or more of cocaine, that person "shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years." 21 U.S.C. § 841(b)(1)(B).  Moreover, if a Section 851 Notice was filed, as here, "such person shall be sentenced to a term of imprisonment which may not be less than 10 years and not more than life imprisonment." Id.

[14]    At Lauria's sentencing, this Court also imposed a $25,000 fine.  Because this is well below the statutory maximum prescribed by 21 U.S.C. § 841(b)(1)(C), there is no Apprendi violation with regard to the fine.

pursuant to Apprendi, that "the absence of a jury determination on an essential element of the offense and the failure to include that element in the indictment" constitutes "plain" error. Id. at 668.  The Second Circuit has made clear that drug quantity is an essential element of a § 841 offense when it is used to impose a sentence above the statutory maximum. Id.  As such, the failure to allege drug quantity in the indictment and the absence of a jury determination of drug quantity in this case and a sentence based thereon above the otherwise applicable statutory maximum constitutes plain error.

c.   <em>Substantial Rights</em>

An error affects a defendant's substantial rights if the error is "prejudicial" and "affected the outcome of the district court proceedings." Id. (quoting Gore, 154 F.3d at 47).  As discussed above, pursuant to the "modified plain-error rule," the government bears the burden of establishing that the error did not affect substantial rights, i.e., that the error was "harmless."

In Thomas, the Second Circuit, viewing the error as an error in sentencing, held that "[i]t is beyond cavil that imprisonment for an additional 52 months beyond the penalty authorized by Congress, as a direct result of the error of using a drug quantity neither charged nor found by the jury, constitutes prejudice." Id. at 669.  The court also held that if they were to proceed from the assumption that the defendant was properly sentenced, but that the error was in the conviction, then the error was akin to a "constructive amendment" of the indictment. Id. at 670-71.  Viewing the error from this perspective, the court held that "an error resulting in a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment is <em>per se</em> prejudicial." Id. at 671.

In this case, the "plain error" resulted in a sentence for Lauria of 420 months, or 35 years.

This sentence is 60 months, or 5 years, beyond the penalty authorized by 21 U.S.C. § 841(b)(1)(C) for an offense involving an unspecified amount of cocaine.  Imprisonment for an additional 60 months beyond the statutory penalty is clearly prejudicial.  Accordingly, as to either of Lauria's arguments—i.e., that there was an error in sentencing, or that the indictment was constructively amended—the error adversely affected his "substantial rights." Id.

As to Pappas, his sentence of 360 months, or 30 years, was not above the otherwise applicable statutory maximum.  21 U.S.C. § 841(b)(1)(C) authorizes a sentence of up to 30 years when an offense involves an unspecified amount of cocaine and when the government files a notice pursuant to § 851 that in the event of conviction, the defendant would be subject to the enhanced penalties provided for in § 841 because of a prior conviction.[15]  Because any consideration of drug type and quantity under 21 U.S.C. § 841, did not lead to the imposition of a sentence greater than the otherwise applicable statutory maximum, see Thomas, 274 F.3d at 664, Pappas' Apprendi claim fails. See Coleman, 329 F.3d at 90 ("Because [the defendant's] sentence does not exceed the otherwise applicable statutory maximum, the sentence does not violate Apprendi."); United States v. Luciano, 311 F.3d 146, 150 (2d Cir. 2002) ("The touchstone of the constitutional inquiry under Apprendi is whether the sentence actually imposed, on the basis of drug quantity not found by the jury, exceeds the statutory maximum that would have applied in the absence of such a finding.").

       *d.       Whether the Error Seriously Affected the Fairness, Integrity or*

---

[15] The government properly filed a prior offender statement pursuant to Section 851.  The district court struck this statement based on a decision by the Court of Appeals, United States v. Collado, 106 F.3d 1097 (2d Cir. 1997), which has since been explicitly overturned by United States v. Ortiz, 143 F.3d 728 (2d Cir. 1998).  Thus, even if the original sentence were vacated, the original Section 851 notice would pertain, or the government would be able to re-file the notice.  Accordingly, the statutory maximum here is 30 years.

*Public Reputation of Judicial Proceedings*

The government argues that the plain error in this case did not seriously affect the fairness, integrity or public reputation of the judicial proceedings, asserting that the "evidence that Count One involved 500 grams or more of cocaine was overwhelming." (Gov't Resp. to Order for Suppl. Briefing re: Lauria 4.)    The Supreme Court, in Cotton, held that the omission of the quantity of drugs from a federal indictment that enhances the penalties under § 841(b), while in violation of Apprendi, does not constitute reversible plain error when the evidence is "overwhelming" and "essentially uncontroverted" to the extent that it does not affect the fairness or integrity of the judicial proceeding. Cotton, 535 U.S. at 633.  This effort is in vain, as "[i]t is for the Court of Appeals, not the district court, to determine whether a plain error seriously affected the fairness of judicial proceedings such that it must be corrected on appeal." Guzman, 277 F. Supp. 2d at 264.  Like the court in Thomas, this Court finds that the error here seriously affected both the fairness and the public reputation of judicial proceedings. See 274 F.3d at 672. By failing to raise the Apprendi issue on direct appeal, Lauria's appellate counsel deprived Lauria of meaningful appellate review.  This error satisfies the two-part Strickland test and constitutes ineffective assistance of counsel.

Having found ineffective assistance of counsel, the question then arises as to what the appropriate relief should be.  Whether this is an error in sentencing or in conviction, the same remedy is appropriate—any prejudice to Lauria can be cured by vacating his sentence and resentencing him, pursuant to 21 U.S.C. § 841(b)(1)(C) to a term of imprisonment not to exceed thirty years. Thomas, 274 F.3d at 673.

B.      **Petitioner Marcos Pappas**

39

In his § 2255 petition, Petitioner Pappas claims (1) that the Federal Controlled Substances Statute and Retaliation Statutes are facially unconstitutional, or in the alternative, unconstitutional as applied; (2) that the superseding indictment must be dismissed due to irregularities in the grand jury proceeding; (3) that he is innocent of the offenses for which he was indicted and convicted; (4) that Count One of the superseding indictment was constructively amended; and (5) that his Sixth Amendment right to the effective assistance of counsel was violated.

### 1. Whether Certain of Pappas' Arguments Have Been Waived

The first two claims set forth in Pappas' § 2255 petition, i.e., that the Federal Controlled Substances Statute and Retaliation Statutes are unconstitutional and that the superseding indictment must be dismissed due to grand jury irregularities, were not raised on direct review and therefore have been waived.[16]  Because Pappas has not shown both "cause" for the default of these claims and "prejudice" resulting from the alleged violation, he is barred from making these claims for the first time on collateral review. See Billy-Eko, 8 F.3d at 113-14.  One of the exceptions to this procedural default rule occurs if a petitioner can make a showing that he is "actually innocent" of crime for which he was convicted. Bousley, 523 U.S. at 622; see also Doe v. Menefee, 391 F.3d 147, 160-61 (2d Cir. 2004) ("An independent category of cases in which petitioners may suffer miscarriages of justice if they are procedurally barred from filing habeas petitions is composed of those cases in which the petitioners claim that they are actually innocent

---

[16]  With respect to Pappas' argument that the Federal Controlled Substances and Retaliation Statutes are unconstitutional, the Second Circuit has joined every other circuit to have addressed the argument and has rejected the claim that Apprendi renders 21 U.S.C. §§ 841 and 846 facially unconstitutional. United States v. Outen, 286 F.3d 622, 634 (2d Cir. 2002).  Accordingly, even if this argument were not waived, it has no merit.

of the crimes for which they were convicted.").  Accordingly, Pappas' claim that he is "actually innocent" of the crimes for which he was convicted will be considered.

2.    Actual Innocence

In Lucidore v. New York State Div. of Parole, 209 F.3d 107 (2d Cir. 2000), the Second Circuit set forth the standard for establishing actual innocence on collateral review:

> In order to demonstrate actual innocence in a so-called collateral proceeding, a petitioner must present "new reliable evidence that was not presented at trial" and "show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." Schlup v. Delo, 513 U.S. 298, 299, 327-28, 130 L. Ed. 2d 808, 115 S. Ct. 851 (1995).

Id. at 114.  "It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623-24, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998).  The Supreme Court has also made clear that "when a habeas petitioner is required to meet the 'actual innocence' standard, he must satisfy a higher hurdle than the 'prejudice' prong of the cause and prejudice standard." De Jesus v. United States, 161 F.3d 99, 103 (2d Cir. 1998).

All of the evidence (or lack of evidence) to which Pappas cites in his § 2255 petition was available at trial, and accordingly, he is unable to satisfy the requirement set forth in Schlup v. Delo that he present "new reliable evidence that was not presented at trial."  He argues only that, as a matter of law, the jury could not have found him guilty of the charged offenses.

a.    *Count One*

Pappas claims, with respect to Count One, that the superseding indictment charged him with conspiracy to possess with intent to distribute a detectable amount of cocaine, but that the sentencing court "entered its judgment on the basis that Pappas was guilty of conspiring to

41

possess with intent to distribute more than 600 grams of cocaine base, and more than 50

kilograms of cocaine powder." (Pappas Pet. 6.)  The substance of this claim is discussed and

found to be without merit in Section III.B.3, below, dealing with Pappas' constructive

amendment claim.  Moreover, the question of whether Pappas is factually guilty of the charge in

Count One has already been settled by the Second Circuit, which found:

> With respect to the cocaine conspiracy count, the government presented ample
> evidence, through the testimony of co-conspirators Fassett and Bellucci, among
> others, that Pappas agreed to possess and distribute cocaine. . . . Accordingly,
> Pappas' challenge to the sufficiency of the evidence fails.

United States v. Pappas, No. 98-1206, 1999 U.S. App. LEXIS 26500, at *10 (2d Cir. Oct. 19,

1999).  Accordingly, the question of Pappas' guilt with respect to Count One has been settled,

and any claims of actual innocence are belied by the extensive evidence of his guilt.

<em>b.    Counts Two and Three</em>

Pappas also claimed, on direct appeal, that there was insufficient evidence presented at

trial to support his conviction on all counts.  The Second Circuit found this claim to be without

merit, holding that:

> With respect to the witness tampering counts, the government presented ample
> evidence showing that Fassett began cooperating with law enforcement authorities
> in December, 1995, that Pappas suspected that Fassett was cooperating, and that
> Pappas assaulted Fassett to retaliate against Fassett for his cooperation. Accordingly,
> Pappas' challenge to the sufficiency of the evidence fails.

Id.  The Court of Appeals, reviewing the full trial record, found that the government proved the

essential elements of all counts beyond a reasonable doubt, thus settling the question of Pappas'

factual guilt.

Pappas asserts that the grand jury which indicted him heard evidence which would

42

support a finding that he retaliated against Ronald Fassett for his having provided information to Detective Robert Proto, but that at trial, the government only presented evidence that Fassett cooperated with and provided information to an assistant United States Attorney.  The indictment provides only that Pappas, Lauria, and Bellucci conspired to and did cause bodily injury to Fassett, with the intent of retaliating against him for providing information to "a law enforcement officer." (Superseding Indictment, Counts Two and Three.)  The government was not required to prove at trial that the information was provided to a specific law enforcement officer, so long as it was a law enforcement officer, as defined in 18 U.S.C. § 1515.[17]  Here, as the Court of Appeals has already found, there was ample evidence presented at trial that Fassett provided evidence, cooperation and assistance in the investigation of federal criminal offenses.  After he provided information to federal narcotics investigators, Fassett plead guilty to certain charges and entered into a formal cooperation agreement with the United States. (See Transcript III at 83:24-85:12.)  As part of this cooperation agreement, Fassett agreed to wear a concealed recording device at the direction of Officer Robert Proto. (Id. at 87:8-23.)  As found by the Court of Appeals on direct review, and as borne out by the evidence presented at trial, Pappas retaliated against Fassett because he believed Fassett was cooperating with federal law enforcement authorities and providing them with information about Pappas and Lauria's narcotics trafficking activity.

---

[17]     "Law enforcement officer" is defined in 18 U.S.C. § 1515 as: "an officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant--(A) authorized under law to engage in or supervise the prevention, detection, investigation, or prosecution of an offense; or (B) serving as a probation or pretrial services officer under this title."  This Court's jury instructions defined law enforcement officer as "an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government who is authorized to prevent, investigate or prosecute offenses." (Transcript VII at 147:24-148:2, July 29, 1997, Doc. No. 213.)  The Court also informed the jury that "Assistant United States Attorney Alex Hernandez is a law enforcement officer." (Id. at 148:3-4.)

Pappas also claims that the Court failed to instruct the jury that to convict Pappas on the retaliation counts, it had to find beyond a reasonable doubt that Fassett gave information to a federal law enforcement officer.  The record establishes, however, that the Court, in the jury charge, defined law enforcement officer consistently with 18 U.S.C. § 1515, and instructed them that, with regard to Count Two, the government must prove that "the defendant acted knowingly and with the specific intent to retaliate against Ronald Fassett for information given to a law enforcement officer concerning or relating to the commission of a federal offense." (Transcript VII 148:25-149:5, July 29, 1997, Doc. No. 213.)

Because Pappas has not shown that he is factually, innocent of the charges for which he was convicted, this Court finds that Pappas' claim of "actual innocence" is without merit.

### 3.    Whether the Indictment was Constructively Amended

The Second Circuit has set forth the fundamental principle behind constructive amendment claims, saying that:

> When the trial evidence or the jury charge operates to broaden the possible bases for conviction from that which appeared in the indictment, the indictment has been constructively amended. Constructive amendment is a per se violation of the Fifth Amendment. To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment. There is no constructive amendment where a generally framed indictment encompasses the specific legal theory or evidence used at trial.

United States v. Milstein, 401 F.3d 53, 65 (2d Cir. 2005) (internal quotation marks and citations omitted).  A constructive amendment can occur only where the charges are constructively broadened at trial; when they are constructively narrowed, there is no constructive amendment. See United States v. Coriaty, 300 F.3d 244, 250 (2d Cir. 2002) (citing Stirone v. United States,

361 U.S. 212, 215-16, 80 S. Ct. 270; 4 L. Ed. 2d 252 (1960); United States v. Miller, 471 U.S.

130, 140, 105 S. Ct. 1811; 85 L. Ed. 2d 99 (1985).

Count One of the superseding indictment charges that Pappas "conspire[d] . . . to possess

with intent to distribute and to distribute a mixture of substance containing a detectable amount

of cocaine, a Schedule II Controlled Substance." (Superseding Indictment 1.)  Pappas contends

that the indictment was constructively amended because (1) the government presented

testimonial evidence to the effect that a lot more than the charged "detectable amount" of cocaine

was involved in the alleged conspiracy, and the trial court instructed the jury that it could convict

on the basis of a finding that any amount was involved, and (2) the trial court preliminarily

instructed the jury that Pappas was charged with conspiring to possess with intent to distribute

cocaine and cocaine base, the government presented evidence that cocaine base was involved in

the alleged conspiracy, and the trial court instructed the jury that the type of controlled substance

was not relevant. (Pappas Pet. 7-8.)

Pappas also argued, on direct appeal, that this Court impermissibly permitted his

indictment to be constructively amended by allowing testimony as to how the defendants

processed cocaine into cocaine base. See United States v. Pappas, No. 98-1206, 1999 U.S. App.

LEXIS 26500, at *10-11 (2d Cir. Oct. 19, 1999).  His claim was rejected, with the Second Circuit

finding:

> the indictment was not constructively amended because cocaine base is a type of
> cocaine, and the indictment charged Pappas with conspiracy to possess cocaine with
> the intent to distribute. The evidence related to cocaine base was therefore admissible
> direct evidence of the charged conspiracy.

Id. at 11 (citing United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994)).  It is well-established in

the Second Circuit that "a § 2255 petition cannot be used to 'relitigate questions which were raised and considered on direct appeal.'" United States v. Sanin, 252 F.3d 79, 83 (2d Cir. 2001) (quoting Cabrera v. United States, 972 F.2d 23, 25 (2d Cir. 1992)).  Because Pappas' argument regarding cocaine and cocaine base was raised and rejected on direct appeal, it cannot be relitigated here, on collateral review.  Moreover, to the extent that the district court may have mentioned cocaine base in the preliminary instructions to the jury, there has not been shown to exist any harm here, where the Court's final instructions to the jury—which were not objected to—cured any such error.[18]  Moreover, Counts Two, Three and Four alleged that the defendants conspired to retaliate and retaliated "for information given by Ronald Fassett to a law enforcement officer in relation to the possible commission of a federal offense, namely, Conspiracy to Possess with Intent to Distribute and Distribution of Cocaine and Cocaine Base . . . ." (Superseding Indictment 2, 4-5.)  Because the charges against the petitioners contained references to cocaine base, it was not improper for this Court to mention cocaine base in its preliminary instructions. The presence of cocaine base was relevant to prove the witnesses' claims that the petitioners conspired to possess cocaine, which was later converted into cocaine base for the purpose of distributing it.  Moreover, any evidence of the petitioners' possession of cocaine base with intent to distribute was relevant to the retaliation charges which alleged that Fassett was providing information concerning a conspiracy to possess with intent to distribute

---

[18]    The Court's jury charge indicates that the jury was properly instructed on Count One, as this Court repeatedly instructed that the offense involved cocaine, (see Transcript VII at 129:18-21 ("Count One charges that the defendants . . . conspired with each other and others to possess with intent to distribute and to distribute cocaine."); id. at 130-31), and that the government must prove beyond a reasonable doubt that cocaine was the object of the conspiracy, (see id. at 138-40 ("The superseding indictment . . . charges the defendants with conspiracy to possess with intent to . . . distribute a controlled substance; that is, cocaine."); id. at 141).

and distribution of cocaine and cocaine base.  Accordingly, this claim is dismissed.

Pappas' claim that the indictment was constructively amended because the government presented evidence establishing that "a lot more" cocaine was attributable to the defendant than the "detectable amount" required in the indictment is also without merit.  The government was entitled to present evidence to support their case, and the mere fact that the government's evidence may have shown that more than a "detectable amount" was involved does not constitute a constructive amendment. See United States v. Smith, No. 04-0775-cr, 2006 U.S. App. LEXIS 24791, at *2 (2d Cir. Sept. 29, 2006) (rejecting the defendant's claim that the indictment was constructively amended and holding that "[w]hile defendant was not charged with a crime that required the government to prove possession of a certain amount of drugs, the government was entitled, in order to prove intent to distribute [in violation of 21 U.S.C. § 841(a)(1)], to show that defendant possessed an amount of drugs that was inconsistent with personal use.").  Evidence of the presence of any cocaine is evidence that a detectable amount was involved.  Accordingly, this claim also fails.

4.    Ineffective Assistance of Counsel

Pappas sets forth a number of allegations in support of his claim that his trial counsel, Bruce Koffsky, was ineffective.  In order to determine the veracity of these allegations, the Court ordered Attorney Koffsky to submit an affidavit and permitted Pappas to file a responsive affidavit addressing Pappas' claims of ineffective assistance of counsel.

a.    Conflict of Interest

Pappas first asserts that his counsel was ineffective because he was suffering from an actual conflict of interest.  The right to counsel under the Sixth Amendment includes "a

correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450

U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981).  The Second Circuit generally groups

attorney conflicts of interest into three general categories: (1) per se conflicts, (2) actual conflicts

and (3) potential conflicts of interest.  Pappas does not contend that the first and third categories,

i.e., per se conflicts[19] and potential conflicts,[20] apply here, and accordingly, only actual conflicts

of interest will be discussed.

Although a petitioner is generally required to show prejudice to prevail on an ineffective

assistance of counsel claim, see Strickland, 466 U.S. at 694, "this is not so when counsel is

burdened by an actual conflict of interest." United States v. Schwarz, 283 F.3d 76, 91 (2d Cir.

2002). Where a petitioner shows "(1) an actual conflict of interest that (2) adversely affected his

counsel's performance," prejudice is presumed. Id.; Armienti v. United States, 234 F.3d 820, 824

(2d Cir. 2000); see also Cuyler v. Sullivan, 446 U.S. 335, 348, 64 L. Ed. 2d 333, 100 S. Ct. 1708

(1980). There is an actual conflict between a lawyer and a client "when, during the course of the

representation, the attorney's and defendant's interests 'diverge with respect to a material factual

or legal issue or to a course of action.'" Winkler v. Keane, 7 F.3d 304, 307 (2d Cir. 1993)

---

[19]   This category encompasses those conflicts that are so severe that they are deemed per se violations
of the Sixth Amendment. United States v. Williams, 372 F.3d 96, 102 (2d Cir. 2004).  Per se
conflicts of interest are unwaivable and do not require a showing that the defendant was prejudiced
by the representation. Id. (citing United States v. Fulton, 5 F.3d 605, 611 (2d Cir. 1993); United
States v. Doe # 1, 272 F.3d 116, 125 (2d Cir. 2001), cert. denied sub nom., Findley v. United
States, 537 U.S. 851, 154 L. Ed. 2d 82, 123 S. Ct. 204 (2002); Armienti v. United States, 234 F.3d
820, 823 (2d Cir. 2000)).  The Second Circuit has found per se conflicts of interest "only where
trial counsel is not authorized to practice law and where trial counsel is implicated in the "same or
closely related criminal conduct" for which the defendant is on trial. Id. (citing Fulton, 5 F.3d at
611; United States v. Cancilla, 725 F.2d 867, 869-71 (2d Cir. 1984)).

[20]   A potential conflict of interest exists where "the interests of the defendant may place the attorney
under inconsistent duties at some time in the future," United States v. Kliti, 156 F.3d 150, 153 n. 3
(2d Cir. 1998), and require a showing that the defendant was prejudiced by the representation.
Williams, 372 F.3d at 102.

(quoting Cuyler v. Sullivan, 446 U.S. 335, 356 n. 3, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980)

(Marshall, J., concurring in part and dissenting in part)).

Pappas contends that Attorney Koffsky was suffering from a conflict of interest based on

the fact that he previously represented Frank Parise, a co-defendant of trial witness Ronald

Fassett from the Luciano matter, United States v. Luciano, 3:95cr135 (PCD).  It is not disputed

that Koffsky represented Parise, however, he did so only for a relatively brief period of time.

Koffsky was appointed to represent Parise for his initial presentment on September 28, 1995, and

represented Parise for his first appearance and arraignment.  Lawrence Hermann appeared on

January 9, 1996, and this Court granted the motion for Koffsky to withdraw as Parise's attorney

on January 25, 1996.  During the approximately four months that Koffsky was serving as Parise's

attorney, he filed a number of motions on his behalf, including a motion to transfer the case to

the New Haven federal courthouse (Doc. No. 261), a motion to adopt the motion of another

defendant to extend time to file pretrial motions (Doc. No. 266), a motion for authorization to

expend money for copying charges (Doc. No. 284), and a motion for review of Parise's detention

order (Doc. No. 290).   Moreover, on November 28, 1995, Koffsky represented Parise at a

detention order review hearing. (See Doc. No. 301.)

The government argues that no conflict of interest results from Koffsky's brief and

limited representation of Parise.  Pappas, however, claims that Ronald Fassett's testimony

benefitted Parise, inasmuch as Fassett took responsibility for the crack cocaine which was seized

from his apartment and testified that the crack was actually possessed as part of a conspiracy

among Fassett, Pappas and Lauria, rather than the Luciano conspiracy that the evidence was

originally charged in.  The Court will assume, *arguendo*, that this is sufficient to establish an

actual conflict of interest.

Once an actual conflict is established, the petitioner "need not prove prejudice, but simply that a lapse in representation resulted from the conflict." United States v. Malpiedi, 62 F.3d 465, 469 (2d Cir. 1995) (internal quotation marks omitted); see also Armienti v. United States, 313 F.3d 807, 811 (2d Cir. 2002). A lapse in representation is established if the petitioner can demonstrate "that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." United States v. Levy, 25 F.3d 146, 157 (2d Cir. 1994) (internal quotation marks omitted). As the Second Circuit held in Malpiedi:

> The test is a strict one because a defendant has a right to an attorney who can make strategic and tactical choices free from any conflict of interest. An attorney who is prevented from pursuing a strategy or tactic because of the canons of ethics is hardly an objective judge of whether that strategy or tactic is sound trial practice. Counsel's inability to make such a conflict-free decision is itself a lapse in representation.

62 F.3d at 469 (internal quotation marks omitted).

Pappas contends that Koffsky's cross-examination of Fassett was limited—such that he did not challenge Fassett's representation that he possessed the crack cocaine at issue with Pappas and Lauria, and failed to seek all information (including the CI 9 information) which is claimed to show that the evidence seized from the Fassetts' apartment was part of the Luciano conspiracy—due to his allegiance to Parise.  The government asserts, in response that Attorney Koffsky "vigorously confronted and cross-examined Fassett." (Gov't Resp. to Order Suppl. Briefing re: Pappas 60.)

The record reveals that Attorney D'Ambrosio, Lauria's trial counsel, confronted and cross-examined Fassett about his involvement with the individuals charged in the Luciano and

Ramirez indictment, tried to develop the defense that Fassett had actually been involved in a conspiracy which did not involve Lauria or Pappas, and tried to place the crack cocaine at issue in the Luciano conspiracy. (See Transcript III at 138:1-25, 140:18-145:19, 161:8-19.)  Moreover, Attorney Koffsky, when cross-examining Fassett, attempted to suggest another reason for Pappas' assault of Fassett, (see id. at 184:19-185:24, 186:22-187:20), and called the witness' character into question by getting him to admit that he was selling narcotics while Pappas was working at a restaurant, (see id. at 187:25-189:2), portraying Fassett as an associate of the Latin Kings gang, (see id. at 189:3-190:19), and generally demonstrating that he was familiar with the violent activity of criminal street gangs, (see id. at 191:5-192:19).  Koffsky introduced a copy of the Luciano indictment into evidence and read the conspiracy count charging Fassett with conspiring with Luciano and others to distribute cocaine. (See id. at 196:18-197:20.)  He then read into the record portions of the Luciano indictment which charged Fassett with the July 1995 and September 1995 crack cocaine seizures. (See id. at 198:1-199:13.)  On cross-examination, Koffsky also called Fassett's credibility into question by getting him to admit that after being indicted in the Luciano conspiracy, he had been held without bond in an unpleasant institution, had learned that he could remain in such an institution for the rest of his life, and only when he found out that he would get a lesser sentence for cooperating did he decide to give assistance to the government. (See id. at 200:7-207:18.)  With regard to evidence seized from the Foster Street Apartment, Attorney Koffsky forced Fassett to concede that all of the physical evidence, including narcotics, cutting agents, a mask, and other narcotics paraphernalia, was all "from your apartment."  Fassett answered "yes" numerous times. (Id. at 208:16-209:8.)  Attorney Koffsky repeatedly tried to develop the theory that Fassett, in testifying against Pappas, was trying to get

his brother, Charles Fassett, out of trouble. (Id. at 209:18-210:12, 213:2-9, 225:21-23.)  Later, Koffsky made Fassett admit that Papas never pointed a gun at him, never threatened him with a knife or baseball bat, and never tried to beat him down. (Id. at 218:15-219:23.)  Finally, Koffsky further impeached Fassett's credibility by demonstrating that although he was making a significant amount of money selling narcotics, he had completed a financial affidavit in which he swore, under oath, that he was indigent. (Id. at 230:4-233:15.)  In sum, Attorney Koffsky challenged Fassett's motive for testifying, attempted to impeach his credibility, raised questions about several aspects of his testimony, and attempted to show that the evidence at issue in this case was actually part of the Luciano conspiracy.  It is difficult to see, based on a review of the record, any "lapse in representation."

In response to Pappas' argument that Attorney Koffsky should have more vigorously attempted to establish that the seized crack cocaine belonged to the Luciano conspirators, the government asserts that Pappas' proffered defense is simply untrue.  In support of this assertion, the government puts forth evidence showing that Pappas and one of his attorneys met with federal law enforcement officers on January 7, 1997 pursuant to a proffer agreement.  The Federal Bureau of Investigation ("FBI") report that came out of that meeting indicates that Pappas "stated that he began to sell cocaine in the beginning of 1994 at which time he was purchasing approximately one (1) ounce of cocaine per week from [name withheld by government] and Ronald Fassett." (FBI Report, Jan. 7, 1997.)  The report goes on to state that Pappas informed the FBI officers that he "would go to . . . [a] New Haven residence to procure the cocaine from . . . Fassett," and that "the cocaine was seized out of 94 Foster Street, New Haven, CT." (Id.)  The report also states that "Pappas added that the 'bundle' of cocaine that was

found in the back seat of the patrol car in which he was detained during this same police raid on

94 Foster Street was not his." (Id.)  Finally, Pappas admitted to the FBI officers that "he and

Lauria would occasionally use the third floor apartment above Nancy's Café, 225 Farren Avenue,

New Haven, CT to rerock cocaine . . . ." (Id.)  Lauria met with federal law enforcement officers

prior to Pappas' meeting, on November 26, 1996.  The FBI report that came out of that meeting

indicates that Lauria made statements consistent with Pappas'.  For example, the report indicates

that "Lauria went on to identify some of his cocaine customers as . . . Ronald Fassett," and that

"[Lauria] gave Fassett nine (9) ounces of cocaine that he was caught with at 94 Foster Street,

which let to his (Fassett's) federal indictment." (FBI Report, Nov. 26, 1997.)  Like Pappas,

Lauria admitted that "the third floor apartment over Nancy's Café . . . was a base of his and

Marcos Pappas' cocaine operation." (Id.)  In view of this evidence, it is difficult to imagine how

Attorney Koffsky would have established the defense that the seized crack cocaine belonged to

the Luciano conspirators.  Pappas has made no showing of specific avenues of inquiry which

Attorney Koffsky should have pursued but did not due to an affiliation with Parise.  Attorney

Koffsky's cross-examination was sufficiently thorough, and although some areas may have been

omitted, further inquiry was not necessary in view of the additional inquiry by co-defendant

Lauria's attorney, Mr. D'Ambrosio.  Aside from arguing that Koffsky lacked a certain degree of

vigor, Pappas has not asserted that he was deficient in any way.  It has not been shown that

Koffsky lacked the vigor required in cross-examining Parise.  Moreover, it has not been shown

that there was an actual conflict, nor that Koffsky's representation was deficient as far as Pappas

was concerned.

> b.     *Other Claims of Ineffective Assistance of Counsel*

First, Pappas claims that Attorney Koffsky met with him only one time prior to trial, for only one and a half hours, and that no trial strategy was ever discussed. (Pappas Pet. 9.) Attorney Koffsky began representing Pappas on or about April 24, 1997, when it became apparent that a there had been a breakdown in communications between Pappas and the CJA counsel appointed to represent him. (Koffksy Aff. 2, Nov. 15, 2006.) Attorney Koffsky asserts that his records reflect that prior to the start of trial on July 21, 1997, he had a telephone conference with Pappas on April 24, 1997, met with Pappas at the Wyatt Detention Facility in Rhode Island for two hours on May 4, 1997, had a telephone conference with Pappas on May 12, 1997, again met with Pappas for two hours at Wyatt on May 15, 1997, and had a conference with Pappas prior to jury selection at the New Haven District Court on June 6, 1997. (Id. at 3.) In addition, Attorney Walkley—Koffsky's then-law partner—had a conference with Pappas at Wyatt on June 27, 1997, had a meeting with Pappas and represented him at a "relatively lengthy" detention hearing on July 1, 1997, appeared with Pappas for purposes of a handwriting exemplar on July 9, 1997, and was present, along with Attorney Koffsky, for jury selection and trial in this matter. (Id. at 3-4.) Attorney Koffsky asserts that trial strategy was discussed during the May 15, 1997 jail visit and throughout his representation of Pappas. (Id. at 4.) In his responsive affidavit, Pappas admits that there was more than one conversation prior to trial, but argues that they were short and that no trial strategy was discussed. (Pappas Aff. ¶ 4, Dec. 5, 2006.)

Second, Pappas claims that Koffsky failed to investigate certain information relating to trial witness Ronald Fassett that Pappas believed was helpful to his case. (Pappas Pet. 9.) Third, with regard to statements allegedly made by Fassett and Paul DeLuca to Pappas' former girlfriend, Pappas asserts that Koffsky failed to interview his former girlfriend and did not call

54

her as a trial witness. (Pappas Pet. 9.)  With regard to Pappas' second and third claims, the

government argues that the fact that Pappas may have had mixed motives in assaulting Fassett

does not change the fact that there was substantial evidence that Pappas was motivated, at least in

part, to retaliate against Fassett for providing information to federal law enforcement authorities.

(Gov't Resp. to Order Suppl. Briefing re: Pappas 71.)  Attorney Koffsky asserts that he

"investigated Ronald Fassett's background, criminal activity, cooperation agreement with the

government, and status as a victim of claimed assaultive conduct on the part of Mr. Pappas," and

as a result of this investigation, "was able to effectively cross-examine witness Fassett." (Koffsky

Aff. 4.)  This Court has already found, in Section III.B.4.A., supra, that Attorney Koffsky's cross-

examination of Fassett was thorough and sufficient.  With regard to Pappas' third claim, Koffsky

asserts that although he does not have a clear recollection of Pappas' former girlfriend's

statements, he "interviewed each and every relevant witness and presented a zealous defense . . .

." (Id. at 5.)  Pappas asserts that he "strongly disagree[s]" with Attorney Koffsky's

representations and "urge[s] the Court to invite Attorney Koffsky to bring the information his

investigation unearthed." (Pappas Aff. ¶ 5, Dec. 5, 2006.)  Pappas also asserts that Attorney

Koffsky never attempted to contact his former fiancé, (see id. ¶ 6), however, Pappas does not

explain why his former fiancé should have been called as a witness and what "highly relevant

information" she possessed that would have changed the result in this case.

Fourth, Pappas alleges that Koffsky possessed information that demonstrated that Pappas

was targeted in the Luciano investigation along with Fassett, although Pappas was neither

charged nor indicted in that matter.  Pappas asserts that because he was neither charged nor

indicted in connection with the Luciano matter, there must be exculpatory information relating to

his lack of involvement. (Pappas Pet. 10.)  Pappas argues that Koffsky was ineffective for failing

to obtain this allegedly exculpatory material. (Id.)  Contrary to Pappas' assertions, Koffsky

maintains that he knows of no exculpatory information that Pappas brought to his attention, or

that he came into possession of during his representation of Pappas that was not discussed at

length with Pappas and used at trial. (Koffsky Aff. 6.)  Even if Pappas is correct that he alerted

Attorney Koffsky to the possibility of exculpatory information arising out of this proceeding, (see

Pappas Aff. ¶ 7, Dec. 5, 2006), there is no evidence supporting Pappas' assertion that there was

any exculpatory information, and it is the government's obligation, rather than the defense

attorney's, to disclose any such exculpatory information.  As such, there is no showing here that

Attorney Koffsky's representation "fell below an objective standard of reasonableness under

prevailing professional norms." Strickland, 466 U.S. at 688.

Fifth, Pappas contends that his rights to confrontation were violated because the alleged

statements made by potential witness Paul DeLuca to Ronald Fassett about what Pappas said to

him about the progress of the conspiracy and the status of the relationship of the parties to the

conspiracy were not investigated by Koffsky and DeLuca was not called to testify at trial.

(Pappas Pet. 11.)  Under Rule 801(d)(2)(e) of the Federal Rules of Evidence, a statement is not

hearsay and therefore is admissible at trial if it "is offered against a party and is . . . a statement

by a coconspirator of a party during the course and in furtherance of the conspiracy."  In United

States v. Paone, 782 F.2d 386, 391 (2d Cir. 1986), the Second Circuit held that the admission of

coconspirators' statements pursuant to Rule 801(d)(2)(E) does not violate the confrontation

clause.

To determine whether a statement may be admitted under Rule 801(d)(2)(E), a court must

find, by a preponderance of the evidence, that (1) a conspiracy existed that included the defendant and the declarant and (2) the declarant's statement was made during the course and in furtherance of that conspiracy. United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999); United States v. Orena, 32 F.3d 704, 711 (2d Cir. 1994) (quoting Bourjaily v. United States, 483 U.S. 171, 175-76, 97 L. Ed. 2d 144, 107 S. Ct. 2775 (1987)).  In making this finding, the trial court need not find that the conspiracy between the declarant and the defendant is identical to any conspiracy that is specifically charged in the indictment. Gigante, 166 F.3d at 82.  Moreover, co-conspirator statements are admissible against any defendant who is a member of the conspiracy even if the defendant joined the conspiracy after such statements were made. See United States v. Badalamenti, 794 F.2d 821, 828 (2d Cir. 1986).  The Second Circuit has established that "once a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming," United States v. Casamento, 887 F.2d 1141, 1156 (2d Cir. 1989), but need only establish "'a likelihood of illicit association' between the coconspirator and the defendant," United States v. Matos, 905 F.2d 30, 34 (2d Cir. 1990) (citation omitted).

DeLuca's statement to Fassett was admitted pursuant to Rule 801(d)(2)(e), and it has not been shown that its admission was improper or that Pappas' confrontation right was violated. Because it appears that the statement properly falls within the ambit of Rule 801(d)(2)(e), it cannot be said that Koffsky's representation "fell below an objective standard of reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688.

Sixth, Pappas claims that Koffsky was ineffective for failing to move to dismiss the retaliation charges on Speedy Trial grounds. (Pappas Pet. 11.)  As this Court has already discussed, neither Pappas nor Lauria had a viable speedy trial objection at the time of trial.

Similarly, Attorney Koffsky notes that leading up to trial, "there were outstanding motions that needed to be ruled upon, including a suppression issue, which would eviscerate [Pappas'] speedy trial claims." (Koffsky Aff. 7.)  Moreover, Attorney Koffsky asserts that he "does not have a clear recollection of any communication or discussion with [Pappas] with regard to moving to dismiss for speedy trial grounds the charge of assaulting Mr. Fassett." (Id.)  Because the Court has found that Pappas did not have a viable speedy trial objection, it cannot be shown that Attorney Koffsky's representation, in failing to move to dismiss on speedy trial grounds, "fell below an objective standard of reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688.

Seventh, Pappas alleges that Koffsky was ineffective for failing to raise any questions about the truthfulness of Ronald Fassett's and Christy Richards-Fassett's testimony, despite alleged inconsistencies in prior statements and "other information bearing on the credibility," providing only a "general attack on credibility" of these witnesses. (Pappas Pet. 11.)  Attorney Koffsky asserts that he had a "full and fair" opportunity to cross-examine Mr. Fassett, and cannot recall any appropriate area of cross-examination that was ignored or deemed irrelevant and which would have been of assistance to Pappas.  Moreover, this Court has already found, in Section III.B.4.A., supra, that Attorney Koffsky's cross-examination of Ronald Fassett was thorough and sufficient.   Moreover, Pappas has not presented any evidence to show that the cross-examination of Christy Richards-Fassett was less than sufficient.

Finally, Pappas argues that because he wanted to testify at trial, but was not prepared to do so, he was deprived of the opportunity to present a "full defense." (Pappas Pet. 11.)  Attorney Koffsky asserts that "it was a strategic decision on the part of both Mr. Pappas and [Attorney

Koffsky] that [Pappas] not testify." (Koffsky Aff. 8.)  Mr. Koffsky explains that although he generally will voice his opinion about whether a client should or should not take the stand to testify, he makes it "abundantly clear" that "it is ultimately the client's decision." (Id. at 9.) Pappas contends that Attorney Koffsky did not give him "any option" with regard to testifying. (Pappas Aff. ¶ 11, Dec. 5, 2006.)  Regardless of how Koffsky advised or prepared Pappas, he has not set forth any reason why, if he had testified, "there is a reasonable probability that . . . the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  Viewing the evidence as a whole, it cannot be said that there is even a "reasonable probability" that the jury's determination would have been different if Pappas had testified.

The evidence does not show, with regard to any of the alleged errors, that Attorney Koffsky's representation of Pappas "fell below an objective standard of reasonableness under prevailing professional norms." Strickland, 46 U.S. at 688.  Moreover, even assuming that they did, Pappas has not shown that in the absence of the alleged errors, "there is a reasonable probability that . . . the result of the proceeding would have been different." Id. at 694.  The assertions set forth in Pappas' affidavits, to the extent that they contradict Attorney Koffsky's representations, are not credited, based on this Court's observations of Pappas' credibility at trial and experience with him up to this time.  His allegations of ineffective assistance of counsel are credibly contradicted by the assertions in the affidavit of Attorney Koffsky, whose presentation of the case was not reflective of the minimal communications, limited investigation and ineffective representation asserted by Pappas.  Further, Attorney Koffsky's representation of Papas and protection of his rights, as observed by this Court, was contrary to Pappas' allegations.

Even considering these alleged errors in the aggregate, and considering the "cumulative

weight of the error, see Lindstadt, 239 F.3d at 199, 202, there is no evidence that the alleged errors affected the result of the proceeding. The evidence against Pappas was overwhelming,[21] and the alleged errors are not supported by the record. In the instant case, all of the alleged instances of ineffective assistance of counsel, considered alone, have been found to be without merit. That result does not change when they are considered in the aggregate.

### C.    Motion for Reconsideration

Petitioner Marcos Pappas also moves for reconsideration of this Court's ruling [Doc. No. 358] denying his discovery motions. For the reasons that follow, Pappas' Motion for Reconsideration [Doc. No. 361] is **granted**, however, the prior ruling is adhered to.

The Supreme Court has made clear that "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997). A habeas petitioner may invoke the processes of discovery if "the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Id. (quoting Habeas Corpus Rule 6(a)). Rule 6(a) makes it clear that the scope and extent of any such discovery is a matter confided to the discretion of the District Court. Id. at 909. In applying this rule, the Supreme Court has noted that discovery is appropriate and the court should "provide the necessary facilities and procedures for an adequate inquiry," "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled

---

[21]    In addition to this Court's finding that the evidence against Pappas was overwhelming, the Court also notes the Second Circuit's rejection of Pappas' challenge to the sufficiency of the evidence against him. See United States v. Pappas, No. 98-1206, 1999 U.S. App. LEXIS 26500, *9-10 (2d Cir. Oct. 19, 1999).

to relief." Id. at 908-09 (quoting Harris v. Nelson, 394 U.S. 286, 299, 89 S. Ct. 1082, 22 L. Ed.
2d 281 (1969)).

In Pappas' original discovery motions [Doc. Nos. 354, 356], Pappas moved for disclosure
of minutes relative to grand jury proceedings in United States v. Luciano, 3:95cr135, in which he
was allegedly implicated in drug trafficking activities but not indicted.  Pappas sought the grand
jury material for purposes of establishing an ineffective assistance of counsel claim.  In his
motion, Pappas cited to a letter from Kevin James Kline, a special agent of the Federal Bureau of
Investigation, which notes "that RONALD FASSETT . . . and MARCOS PAPPAS . . . are
associates of LUCIANO and involved with him in his distribution activities" and that "AUSA
ALEX HERNANDEZ advised that his office would adopt prosecution of Fassett and PAPPAS as
part of the above-captioned investigation."  Because Fassett was indicted and Pappas was not in
Luciano case, Pappas infers therefrom that the grand jury minutes must include some exculpatory
information with regard to him.  In denying Pappas' motions, this Court held that Pappas failed
to establish a "particularized need" for the material.  Specifically, this Court noted that the fact
that Pappas was not indicted in the Luciano matter does not necessarily mean that exculpatory
evidence was presented to the grand jury.  Moreover, the Court noted that to the extent that any
exculpatory material exists, the government has a constitutional obligation to disclose such
material.

Pappas argues, in his Motion for Reconsideration, that contrary to the government's
representations, there was exculpatory evidence presented in the Luciano grand jury proceeding.
Regardless of whether exculpatory evidence existed with regard to Pappas' involvement in that
case or not, this Court is aware of no precedent that would require an attorney to inquire into

grand jury proceedings in an entirely separate criminal matter in which his client was indicted.

See Dennis v. United States, 384 U.S. 855, 870, 86 S. Ct. 1840, 1849, 16 L. Ed. 2d 973 (1966)

("problems concerning the use of the grand jury transcript at the trial to impeach a witness, to

refresh his recollection, to test his credibility . . . are cases of particularized need where the

secrecy of the proceedings is lifted discretely and limitedly") (internal quotation marks and

citation omitted); Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 400, 79 S. Ct. 1237,

1241, 3 L. Ed. 2d 1323 (1959).  Trial counsel is under a duty to conduct "an independent

examination of the facts, circumstances, pleadings and laws involved" in his client's case,

Strickland, 466 U.S. at 680, however, this does not include a duty to inquire into separate grand

jury proceedings or to presume that the government, under penalty of mistrial, would violate its

duty of disclosure.  Pappas' attorney's failure to inquire into separate, independent grand jury

proceedings and his reliance on the government to adhere to its duty of disclosure does not

constitute performance falling "below an objective standard of reasonableness under prevailing

professional norms," id. at 688, and cannot not be said to be unreasonable viewed "from

counsel's perspective at the time," Wiggins v. Smith, 539 U.S. 510, 523, 123 S. Ct. 2527, 156 L.

Ed. 2d 471 (2003).  As in the prior ruling, this Court finds that Pappas has failed to show either

the "particularized need" or "good cause" necessary to invoke the processes of discovery.  As

such, his motion for leave to invoke the processes of discovery was properly denied.

**IV.    CONCLUSION**

     For the foregoing reasons, Petitioner Lauria's motion [Doc. No. 317] is **granted in part**

and **denied in part** and Petitioner Pappas' motion [Doc. No. 318] is **denied**.  This Court was

able to rule on Petitioners' motions based on the record before the Court, and accordingly,

Petitioners' Motion for a Hearing [Doc. No. 362] is **denied**.  Petitioners also filed a Motion for

Issuance of a Writ of Habeas Corpus, asking the Court to issue an order that the United States

Marshall Service take custody of them in order to produce them in court for purposes of the

hearing on their § 2255 petitions.  Because the petitions were dealt with on the record before the

Court, and because the motion for a hearing was denied, Petitioners' Motion for Issuance of a

Writ of Habeas Corpus [Doc. No. 404] is also **denied**.  Petitioners also moved for a

teleconference, however, this Court finds that it is able to decide the motion without the necessity

of a teleconference.  As such, Petitioners' Motion for a Teleconference [Doc. No. 408] is **denied**.

Finally, Pappas' Motion for Reconsideration [Doc. No. 361] is **granted**, however, upon

reconsideration, the prior ruling denying discovery is adhered to.

SO ORDERED.

Dated at New Haven, Connecticut, December  13 , 2006.

_____
/s/
Peter C. Dorsey, U.S. District Judge
District of Connecticut